EDWARD C. BELLAMY, APPELLANT, VS. THE SHERIFF OF JACK-SON COUNTY, EX OFFICIO ADMINISTRATOR OF SAMUEL C. BEL-LAMY, DECEASED, APPELLEE.

1. A debtor in insolvent circumstances may, before lien attaches, lawfully prefer one creditor, or set of creditors to another.

2. A sale, assignment or other conveyance, is not necessarily fraudulent, because it may operate to the prejudice of a particular creditor.

Edward C. Bellamy *vs.* Samuel C. Bellamy's Adm'r.—Statement of Case.

3. A deed made with the purpose or intent to hinder, delay or defraud creditors, is binding as between the parties ; but as to creditors it is deemed to have no lawful existence.

4. In equity, the general maxim of *pari delicto*, &c., does not always prevail; circumstances of the particular case, often form exceptions, and where it is necessary, relief will be granted.

5. In an assignment to a trustee who accepts the trust, and enters upon the duties thereof for the use of certain creditors, the legal estate passes and vests in the trustee, and chancery will compel the execution of the trust for the benefit of the said creditors, though they be not at the time assenting, and parties to the conveyance.

6. In a deed of trust, wherein after specifying certain slaves by name, and also enumerating other personal property, and then adding a general clause, viz : " *and all his personal effects of every name, nature and description*," &c. Held to embrace things *ejusdem generis*, with those which had been mentioned before, and to convey for the purposes of the trust, any other slaves, which then belonged to the grantor and not before specified by name, and especially where the *res gestæ* favors that construction, but not to pass real estate, or equity of redemption in land.

7. It is essential to the conveyance of real estate that there be some description of the land.

8. In a deed of assignment to a trustee conveying " *all the future cotton crops made on said plantation*," an estate is conveyed commensurate with the trust ; and although it does not pass the equity of redemption in said land, yet it is a fiduciary license, lease or conveyance thereof, and of all that was necessary to the management of the plantation and appropriation of said crops for the objects and purposes of said trust.

9. A deed of assignment is to be construed by the *res gestæ*, and thus Courts are permitted to look to the circumstances and motives which led to its execution, and the objects to be accomplished.

10. In all cases where a purchase has been made by a trustee, on his own account, of the estate of his *cestui que* trust, although sold at public auction it is in the option of the *cestui que* trust to set aside the sale, whether *bona fide* made or not, and particularly where there are inequitable features in the transaction.

11. A trustee is bound not to do anything which can place him in a position inconsistent with the interests of the trust, or which have a tendency to interfere with his duty in discharging it.

Appeal from a decree of the Circuit Court for Jackson County. A full statement of facts is to be found in the opinion of the Court to which reference is made.

*M. A. Long & W. G. M. Davis*, for Appellant.

*J. T. Archer & G. S. Hawkins*, for Appellee.

Hon. W. A. FORWARD, Judge of the Eastern Circuit, (who with Hon. T. F. King, Judge of the Southern Circuit, sat at the hearing of this case, in place of Baltzell, C. J., and DuPont, J., who were disqualified by reason of having been of counsel in the Court below,) delivered the opinion of the Court.

Samuel C. Bellamy in his life time, filed his bill in equity against Edward C. Bellamy, the Union Bank of Florida, and seventeen others, *creditors of the said complainant,* and *beneficiaries* under the deeds hereinafter set forth, and alleged to be trust deeds. He charged, " that before and on the 19th November, 1844, he was in possession of a plantation and slaves in the County of Jackson, well stocked with horses, mules, cattle, hogs, farming utensils, provisions, &c., for the successful cultivation thereof, and had on the premises the greater portion of the crop grown and raised thereon-in 1844 ; that at that time though not heavily in debt in proportion to the value of his property, apart from the Bank debt due the Union Bank of Florida, the principal of which, by payment of the annual interest, might have been deferred for many years, yet he was much harassed in mind by the existence of judgments and executions then recently rendered and obtained against him, and of suits progressing to judgment and execution, which, not having immediate cash resources to pay off and discharge; *he feared would come down upon him before mon-*

*ey could be realized from his crops and other resources, and by seizure of slaves, stock, farming tools and utensils, utterly prevent him from paying his debts, bring loss and distress upon his securities and endorsers, and immediate ruin upon himself.*

" That being thus induced to believe he could not protect and do justice to those who, without pecuniary considera-tion, and as an act of friendship and kindness to himself, were implicated for him as sureties and endorsers, as well as all his creditors at large and prevent the sacrifice and de-struction of their and his interests, which would be com-pletely effected by *breaking up his planting* operations by a forced sale of his unincumbered personalty at a ruinous rate of depreciation, save by the execution of a trust deed, which while it preferred his endorsers and other sureties, *would also protect the interests of all other persons to whom he was in any wise indebted, and secure the payment of their demand.* That to effectuate this intention he executed to his brother, the defendant, Edward C. Bellamy, who was also one of his endorsers and sureties, a deed of conveyance in trust, which is made an *exhibit* to said bill, and is in the words and figures following, to wit :

Territory of Florida, }<br>Jackson County. }

"This indenture made and entered into this nineteenth day of November, in the year of our Lord, one thousand eight hundred and forty-four, by and between Samuel C. Bellamy of the one part, and Edward C. Bellamy of the other part, both of said Territory and County, witnesseth, that the said Samuel C. Bellamy, deeming himself morally bound to protect, secure and indemnify those, who from af-fection or friendship are equally involved with him in cer-

tain contracts and obligations, and desirous of affording to such persons such guaranty as he may against any risk or liability which they have thus voluntarily and disinterestedly incurred ; and whereas, his brother, Edward Bellamy and others hereinafter specified, and the said Samuel C. Bellamy, being anxious to assure to them just claims in advance ; this indenture therefore witnesseth, that the said Samuel C. Bellamy, in consideration of the premises as well as the sum of one dollar received, hath granted, bargained, sold, aliened, conveyed and confirmed, and by these presents doth herein grant, bargain, sell, convey, assign, transfer and deliver unto the said Edward Bellamy, all the property and estate hereinafter described and specified, to wit : the following slaves, viz : Tony, Sally, Flora, Esop and Cinda ; also his stock of horses, mules, cattle and hogs, of which he is now in possession, and which cannot be more particularly described, together with his household and kitchen furniture, and all his personal effects of every name, nature and description, corn, wagons, carts, &c. ; also his crop of cotton of the present year, whether now in bales, in the gin house or in the field ; also all his right and interest in and to the contract for constructing the bridge across the Chipola river near Marianna. To have and to hold all and singular, the property above described, and every particle thereof, to the said Edward Bellamy, his heirs and assigns forever.

" Nevertheless, upon this especial trust and confidence herein and hereby created and declared, to wit : that the aforesaid Edward Bellamy shall have and hold the aforesaid property upon the following stated trust and for these interests, objects and purposes, hereinafter set forth, that is to say, that the said Samuel C. Bellamy shall continue and

remain in possession of all this property and effects above specified, and shall proceed with his contract in relation to the bridge, that the said Edward C. Bellamy shall receive all the rents, profits, hire and income, derived from the same, to wit : the services and labor of said personal property, and the funds arising from said bridge contract, after paying necessary expenses, the said income, hire and funds to be held and applied by said Edward Bellamy for the following purposes, to wit : to reimburse, secure and indemnify the said Edward Bellamy in and upon his liabilities as endorser or security for and with said Samuel C. Bellamy, to the Life and Trust Bank of Florida, amount about twenty-seven hundred dollars ; also for surety-ship of said Edward Bellamy on note to Miles Everett, of Washington County, Florida, one thousand dollars; for the indemnity of Doctor Etheldred Phillips, surety on note of about two hundred dollars ; Doctor Bradford, endorser on a bill of exchange of seven hundred dollars ; Mr. William Bellamy, of North Carolina, surety on a contract of seven or eight hundred dollars ; Isaac Widgeon, judgment of six hundred dollars ; Alexander Croom, on a draft now in suit about five hundred dollars ; lastly, for the payment of all just claims not now sued, and more particularly for the protection and indemnity of the sureties of said Samuel C. Bellamy on his bond for the bridge contract, and finally and especially, for the paying with all due promptness, the interest on the bank stock of said Samuel C. Bellamy, accruing to the Union Bank of Florida, and generally for the indemnity of all sureties of said Samuel C. Bellamy, who, reposing in his integrity, have loaned him their name considering them as the others, as preferred creditors, for whose security this deed is made. It is hereby provided,

that said Samuel C. Bellamy shall at any future time execute any other instrument necessary to effectuate the intents and purposes of this indenture, upon being thereto duly advised. And it is herein especially provided, that when the purposes and objects of this indenture shall have been accomplished and attained by the payment or satisfaction of the aforesaid debts, claims and liabilities, either from the income of the said property or from any other source, then and in that event, whenever it shall have been in any mode realized and consummated, the said Edward Bellamy shall upon the request of said Samuel C. Bellamy, release, reconvey and deliver all the property hereby conveyed, and all his interest and right therein, either in equity or at law, hereby vested.

"And it is herein further provided, that all the future cotton crops made on said plantation shall be appropriated by said Edward Bellamy, trustee, to the purposes and objects above set forth and declared, especially the interest on the Union Bank stock, excepting part of said cotton crop as well as corn, also hereby conveyed, as shall be requisite for necessary expenditures and subsistence.

"And it is especially in conclusion provided, that one half of the nett proceeds of the bridge contract, after all necessary disbursements therein, shall be applied by said Edward Bellamy to the payment of a claim due estate of William Sullivan, late of this County, deceased.

"And it is herein especially provided, that a debt or claim or accommodation debt due Union Bank of Florida, and a debt due Mrs. Oveton, of Pensacola, are excluded from this trust, and the said Edward Bellamy, on his part, accepts this appointment of trustee conferred by this deed, assumes the office and covenant for himself, his heirs and assigns,

to observe the provisions of this indenture and perform the duties it creates, and preserve and maintain the confidence it reposes, according to its true meaning, interpretation, intents and designs; and said Edward Bellamy hereby acknowledges delivery of the property herein conveyed.    In testimony of all and singular whereof, the parties have executed this indenture by signing, sealing and delivering the same, this nineteenth day of November, A. D., 1844, second page, eleventh line from the top, words " one thousand dollars," interlined before signing."

Signed,  } S. C. Bellamy, [L. S.]

E. C. Bellamy, [L. S.]

Executed in presence of
A. L. Woodward.

Frederick R. Pittman, Clerk C. C., J. C.

He further charges that said Edward C. Bellamy, as such trustee, possessed himself of all the property mentioned and specified in the said deed of trust, and also of the crops of cotton, corn and other produce grown and raised on the said plantation in the years 1844 and 1845, and still holds the same, unaccounted for; and he also *possessed himself* of the crops of cotton and other produce grown and raised on the plantation, and with the slaves of said complainant, in the years 1846 and 1847, and was at the time of filing said bill, in possession and planting a crop for 1848, and that he had, also, on divers occasions, employed a portion of your orator's slaves in labor for himself, the said Edward Bellamy, and others, off the said plantatation, of all which he had rendered no account to the said complainant.

He further charges, that notwithstanding he became so

**70**                    SUPREME COURT,

Edward C. Bellamy *vs.* Samuel C. Bellamy's Adm'r.— Statement of Case.

possessed, the said Edward C. Bellamy, though by such possession having sufficient means, resources and property to have arranged with and satisfied all the creditors then having executions, and others, as their suits matured into judgment and execution, began to harass the complainant with suggestions of apprehensions that the said deed of trust, would prove insufficient to protect and indemnify his sureties, and that it would be assailed and defeated, by reason of the preferences so given to his endorsers and sureties, on the complaint of other creditors, and therefore some other and additional indemnity should be provided for them.

He further charges, that harassed by the ruin impending or which he in consequence of the representations of said Edward C. Bellamy, supposed to be impending and near at hand, and in which he would involve his sureties, combined with the result of an unfortunate habit of indulging in the use of intoxicating liquors, by which his mind was rendered utterly incompetent to know and appreciate his real situation, or to perform any of the duties incident to the ownership of property, and in fact being at times actually insane, and incapable of contracting and being contracted with, yielding himself to the direction, control and management of the said Edward C. Bellamy, and whilst in this situation, he executed the following deed of conveyance, which is also made a part of said bill, to wit:

"Whereas, Samuel C. Bellamy did heretofore, to wit, on the first day of March, 1841, execute to the Union Bank of Florida, two mortgages by which he conveyed among other things, the real estate and slaves hereinafter described, being the same slaves and their increase, except those which have died, mentioned and conveyed in and by said

mortgages. And whereas, said mortgages were made to secure to said Bank the payment of three hundred and twenty-two shares of the capital stock of said Bank, all of which will more fully appear by reference to said mortgages, which were duly recorded in the office of the Clerk of the County Court of Jackson County. And whereas, after the execution of said mortgages the said Samuel C. Bellamy did receive from said Bank a loan of two-thirds of the amount of his said stock, being about the sum of twenty-one thousand nine hundred and thirty-one dollars, and made and delivered to said Bank his note commonly called a stock note, therefor, which was renewed, and the interest paid thereon until about the		day of		. And whereas, there is now due to the said Bank from the said Samuel C. Bellamy, besides the said stock, about the sum of five thousand and sixteen dollars, being the interest which has accrued on the said stock note since the last renewal of the same.

"Now this indenture made and entered into this 13th day of December, in the year of our Lord, 1845, between the said Samuel C. Bellamy of the one part, and Edward C. Bellamy of the other part, both of the County of Jackson and State of Florida, witnesseth, that for and in consideration of the sum of six thousand dollars to him in hand paid by the said Edward C. Bellamy, the receipt whereof is hereby acknowledged, the said Samuel C. Bellamy hath granted, bargained, sold, aliened and conveyed, and by these presents doth grant, bargain, sell, alien and convey to the said Edward C. Bellamy, his heirs and assigns, the following described real estate and negro slaves, subject, however, to the rights of the said Union Bank, in and by said mortgages, stock note, and interest due thereon as above mentioned, that is to say:

" The south-west quarter of section thirteen, township five, north, range eleven, west; the east half of the north-east quarter of section twenty-three, township five, north, range eleven, west ; the east half of the south-east quarter of section fourteen, township five, north, range eleven, west ; the north-east quarter of section fourteen, township five, north, range eleven, west; the west half of the north-east quarter of section fourteen, township five, north, range eleven, west ; the west half of the north-west quarter of section thirteen, township five, north, range eleven, west ; the west half of the south-west quarter of section twelve, township five, north, range eleven, west ; the south-west quarter of section eleven, township five, north, range eleven, west ; the north-east quarter of section eleven, township five, north, range eleven, west ; containing in all about twelve hundred acres, be the same more or less.   And the following described negro slaves, to wit :

"Fife, about seventy years old ; George, about thirty years old ; Sam, about twenty-eight years old ; Levi, about thirty years old ; Jim, about sixty years old ; Virgil, about forty-five years old ; Amos, about fifty years old ; Willie, about forty-five years old ; Cæsar, about sixty years old ; Peter, about thirty years old ; Daniel, about twenty-five years old ; Dick, about twenty-one years old ; Isaac, about twenty-two years old ; Quincy, a boy, about twenty years old ; Holertie, about sixteen years old ; Warrenton about eighteen years old ; Jim, jr., about fifteen years old ; Marcus, about twenty years old ; Silas, about fifteen yeas old ; Sally, about forty years old ; Chany, about forty-five years old ; Nancy, about fifty years old ; Jennet, about thirty-two years old ; Laney, a woman, about thirty

years old; Haley, about thirty years old; Esther, about twenty-five years old; Hagar, about twenty-four years old; Delia, about twenty-two years old; Hannah, about twenty years old; Venus, about twenty years old; Rose, about eighteen years old; Amy, about thirteen years old; Julia, about twenty years old; Fanny, about twenty years old; Matilda, about eighteen years old; Lucy, about fourteen years old; Jane, about twelve years old; Charity, about twelve years old; Solomon, about eight years old; Daphne, a girl, about ten years old; Emily, about thirteen years old; Elias, about nine years old; Alfred, about eight years old; Sarah, about eight years old; Bill, about ten years old; Delphi, about five years old; Delilah, about three years old; Chance, a boy, about ten years old; Henry, about twelve years old; Calvin, a boy, about ten years old; Agga, about twenty-three years old; and the following named children, all under the age of five years, to wit: Tom, Marcus, Eliza, Joshua, Bob, Jefferson, John, Frank, Venus, jr., Abby, Margaret, Rany and Teny. To have and to hold the above described real estate and negro slaves with the equity of redemption, and all the rights which the said Samuel C. Bellamy has in and to the same, to the only proper use and benefit and behoof of him, the said Edward C. Bellamy, his heirs, executors, administrators and assigns forever. And the said Samuel C. Bellamy doth covenant and agree to and with the said Edward C. Bellamy his heirs, executors and assigns in manner following, to wit: First, that there is no other lien or encumbrance on the said real estate, and slaves herein conveyed except that above mentioned. And second, that the said Samuel C. Bellamy has full power, right and authority to sell and convey the same subject only to the rights of the

10

said Union Bank in and by said mortgages, stock note and interest due thereon and none other.

"In witness whereof I, the said Samuel C. Bellamy, hath set my hand and seal the day and year above written."

Signed,                    Samuel C. Bellamy, [L. S.]

Signed, sealed and delivered in presence of

E. Phillips,

S. W. Carmack.

Which said slaves he avers, were conveyed in and by the general terms, " *all his personal effects of every name and description* " contained in said trust deed of November 19th, 1844.

On page 13 m, of the printed record, it appears that the respondent (E. C. Bellamy,) read in evidence the following paper, to wit:

" In consideration of a deed of conveyance this day executed by Samuel C. Bellamy, conveying to me his estate, consisting of an equity of redemption in the land and negroes mentioned therein, I hereby covenant and agree to and with the said Samuel C. Bellamy to pay for the same the sum of six thousand dollars in manner following, to wit: a judgment in the name of S. C. Robbins for about twenty-seven hundred dollars besides interest, rendered against said S. C. Bellamy in the Court of Appeals, at the January term, 1845. A note due to Miles Everett for about thirteen hundred dollars including interest. A note due to the executors or administrators of H. Johnson, deceased, of North Carolina, for which William Bellamy is bound as security of said Samuel C. Bellamy, for about the sum of one thousand dollars with interest. A judgment in favor of William Baker against said Samuel C. Bellamy, for which Doctor E. Phillips is liable as his secu-

rity, for about two hundred and eighty dollars, and the balance of said six thousand dollars, if any there be after deducting the above payment, and the payment of about six hundred dollars, already made by me to Ely Moore, the overseer of said Samuel C. Bellamy, and for negro shoes, and rope and bagging for the present year's crop, is to be paid to such of the creditors of said Samuel C. Bellamy, as he may direct. Witness my hand and seal, this 13th day of December, 1845"

E. C. Bellamy, [L. S.]

Test:
 E. Phillips,
 S. W. Carmack.

Which is admitted to be the agreement entered into between them, at the time of executing said last mentioned deed.

He further avers and says, that although he cannot say positively, that he executed said last deed, in accordance with the provision in the *trust* deed, his uniform impression and belief has been, that it was then urged and impressed upon him by the said Edward C. Bellamy and his counsel that the said last mentioned deed was in furtherance of the objects and purposes of said trust deed, and not in anywise inconsistent therewith.

He further says, that as for the sum of $6000, the consideration in said deed expressed to have been paid by the said Edward C. Bellamy, the same is so grossly inadequate as to be a fraud, if there was no trust; yet the same or any part thereof, was never paid to him by the said Edward C. Bellamy at the time of the execution of the said deed or at any time since.

He further charges, that if said Edward C. Bellamy has

paid any money for the use of the complainant as the consideration of said deed, it *was made from the trust* property or funds of said complainant *already in his hands,* or while he had sufficient amount of the said trust funds in his possession and control, applicable to the discharge of such debts.

He further charges, that if said last mentioned deed is claimed as an absolute conveyance, it is wholly without consideration and void.

He further charges, that the said Edward C. Bellamy should in a court of Equity, be decreed to be a trustee for the said property and for the due management of the same, and for the rents, issues and profits thereof made, and which under due and proper care and management, ought to have been made, so far as the same conveys property not conveyed in the trust deed of November, 19th, 1844.

Lastly, he charges violation and dereliction of his duty as trustee, to the great detriment and destruction of the funds, and to the great injury of the complainant and his creditors.

The prayer of the bill was, that he, the said Edward C. Bellamy, be declared a trustee of and concerning the property mentioned and specified in the deed of 1845 ; and that he render a full, true and perfect account in detail, of all and singular the trust property and funds committed to his charge, and the rents, issues, profits and proceeds of every description issuing out of the same, or accruing therefrom, which he or any person for him, or by his consent or procurement, received therefrom, or which he might, could and ought, by proper management, diligence and care, to have received therefrom ; and that the said E. C. Bellamy be removed from his said trust, and ousted of his

said trust estate, and be enjoined from all further interference with, or any control over, and management of the said trust property.

That the creditors specified be made defendants, and required to answer and set forth respectively the situation of their claims, &c. And that a receiver be appointed, to act as trustee, to receive and take possession of said plantation, slaves, &c., to provide for, keep up, maintain, manage and control the same, &c., and pay the clear residue after paying expenses, &c., to the creditors of complainant ; and also to arrange with the Union Bank, so as to reinstate the said stock loan and continue the same, according to the charter of said Bank. And finally, after the purposes of said trust shall be accomplished, by the discharge of the debts, to deliver to him said property, real and personal, &c., and general prayer for other and further relief, &c. It does not appear in the record whether any of the defendants excepting Doctor E. C. Bellamy, were ever served with subpœna, or made any appearance or answer ; there is no decree *pro confesso*. The defendant Doctor E. C. Bellamy's answer, so far as we think necessary to extract from it, is in substance as follows :

" That he was an endorser, at the request and for the accommodation of said complainant, on a note payable to the Life and Trust Bank, and also a note payable to said Miles Everett. That some time in the fall of 1844, the said complainant came to the house of this defendant, and informed him that he was so much involved that he could not go on with his business, and that unless he made a deed of trust for the benefit of his endorsers that this defendant as well as other endorsers, would lose money by him. That this defendant being anxious to secure himself

against losses on account of his endorsements, upon being
informed of the embarrassments of the complainant, read-
ily agreed to accept the security and indemnity proposed
by him.    That complainant procured the deed, exhibit
A B, and brought it to this defendant to sign, telling this
defendant that it was a deed of trust for his (this defend-
ant's) security, and for the security of other preferred cred-
itors therein named ; and this defendant presuming that it
would secure the objects avowed, executed and accept-
ed it.

"That at that time there were executions of the exis-
tence of which he avers, he, this defendant, was ignorant,
for a large amount, say from $6000 to $8000, in the hands
of the Mashal against the said complainant ; and to the
great surprise and astonishment of this defendant, the a-
mount of $4000 or more of said executions was soon after
levied upon all the mules, horses, and what the Marshal
estimated to be about 75 bales of cotton, then in the field,
it being a part of the property in said deed of trust.  That
after said levy, being urged by the complainant and fear-
ing he might make himself liable to the other *cestuis que*
*trust*, in said deed, by neglect of duty as trustee, he inter-
posed his claim in that character, to the property levied
upon, and gave bond and security as is directed by law in
such cases, determining in this manner to submit the said
deed of trust to judicial investigation and construction.

"That things remained in this position until the fall of
1845, in which year " *this defendant went on to make the
crop, paying the overseer and other expenses for negro cloth-
ing, bagging and rope, &c., out of his own money.*"    That
as soon as the crop was fairly made and about 50 bales
picked out, the Sheriff of Jackson County levied *two* other

executions in favor of Sullivan's administrator and Miles Vance, amounting to about $4000, upon all the crop of cotton of the year 1845, and *all the* other property in said deed of trust, except such as had been levied upon before.

"That he put in a claim also for this property, and that at the next term of the Court these claims were tried, and this deed of trust, attacked by said judgment creditors was determined fraudulent and void as to said creditors, and this property was found subject to said executions, and he " *alleges that said deed of trust was fraudulent and void ab initio, as to execution creditors existing at the time said deed was executed, and that being void in part it is void in toto.*"

" That after said property was so found subject as aforesaid, that he returned it all to the Sheriff, except the two lots of cotton of 42 and 62 bales, and that it was sold by the Shersff to satisfy the executions in his hands so levied as aforesaid.

"That instead of there being 75 bales, when ginned, in the first lot of cotton levied by the Marshal, there were only 42, which were sold by this defendant, and the Life and Trust Bank debt paid with the proceeds.

" That the 62 bales were sold by this defendant and the proceeds applied to the payment of the said executions of. Sullivan and of Vance. That having thus shown what became of all the property conveyed in said deed of trust, he denies that the right and equity of redemption which was afterwards conveyed in the deed of 1845, was *intended* to be conveyed in said deed in trust, under the general terms therein employed, to wit, " all his personal effects of every name, nature and description," as is alleged in said bill."

" This defendant further answering, says : That in the

early part of December, 1845, he was in Tallahassee, for
the purpose of procuring a judgment against him as en-
dorser, and the said complainant as principal, which had
been rendered against them in the Court below, in Jack-
son County, and which had been affirmed in the Supreme
Court, so that it might be placed in the hands of the Clerk
of the Inferior Court, and an execution issued thereon, for
the said complainant was in a failing condition ; and this
defendant finding that he had leaned upon a broken reed,
when he reposed upon said deed in trust for security as the
endorser of said complainant, was anxious to take every
step by which he might even partially indemnify himself
for the heavy liabilities he had incurred, as endorser and
security for said complainant.    When this defendant re-
turned from this mission to Tallahassee, he found the said
complainant and Judge Carmack at his home ;    and the
said complainant notwithstanding all the trouble and dif-
ficulty in which he had already involved this defendant,
insisted upon making another " deed in trust," but this de-
fendant *promptly and positively refused to have anything
more to do with " deeds in trust," or anything of the kind,*
preferring to run the risk of losing the money he had ad-
vanced for the said complainant, and also what he was li-
able for as his endorser and security, rather than have
anything more to do with "trusts," or rely again on ropes
of sand.    The said complainant, still professing a great
desire to secure his endorsers against losses on his account,
this defendant said to him that he, the complainant, still
had a remaining interest in some property mortgaged to
the Union Bank of Florida, which at that time, as the de-
fendant was advised, was not subject to execution, the
Statute authorizing the sale of equity of redemption under
execution not then being enacted.

" This defendant further said to the said complainant, that if he was serious in the desire to protect him against liabilities as his endorser, and would, in good faith, sell him his remaining interest, or equity of redemption, in so much of his, the said complainant's, bank property, as would be sufficient to cover the advances and liabilities which this defendant had incurred for the said complainant, and some other debts, about which the said complainant expressed great anxiety, that this defendant would go to some estimate of the value of the interest in the property agreed to be conveyed, and also an estimate of the amount of debts desired by the complainant to be secured. At this time, a suit was pending against the said complainant by the Union Bank for a large amount of money theretofore loaned to the said complainant, and it was then the general impression in the country that the property mortgaged to the Bank would be subject to execution to satisfy judgments obtained by said Bank in such cases ; and the artful " and designing complainant," finding that this defendant could be no longer duped into a participation in fraudulent deeds of trust, and fearing that his mortgaged property would be sold to satisfy the said debt for loaned money, which would soon be matured into judgment against him, in favor of the Bank, he, the said complainant, without any undue influences upon the part of this defendant, and with a full knowledge of the situation of his affairs, agreed to convey to this defendant all his remaining interest in so much of the said Bank property, as would be sufficient to secure this defendant against his said liabilities on the said complainant's account, and certain other debts, about which the complainant expressed great solicitude and anxiety as aforesaid. That thereupon

11

the said complainant and this defendant left this defend-ant's house, in company with Judge Carmack, and went to Marianna, for the purpose of effecting the conveyance of the said interest of the said complainant in a portion of the said mortgaged property as above indicated. The said complainant furnished a list of the slaves and land, his interest or equity of redemption in which was intended to be conveyed, and a description of the same, and the Hon. Samuel Carmack, who was employed by the siad complainaut for that purpose, drafted the deed of convey-ance. After the conveyance was drawn, the complainant came, in an intoxicated state, before defendant and the said Carmack, and signed the same ; but this defendant posi-tively refused to accept the delivery thereof, on account of its being signed and sealed by the complainant in the situation in which he then was. The complainant then came back on the following morning in a sober and ration-al situation, and executed a newly drawn deed, the same in substance as the one he had signed the day before, which last deed, as well as the former, was drafted at the request and under the direction of the said complainant. This defendant accepted the delivery of the last mentioned deed of conveyance referred to in complainant's bill of complaint, and therein designated as exhibit B.

" As to the consideration mentioned in said deed, to wit, the sum of six thousand dollars, this defendant alleges that it was sufficient, adequate and equal to the value of the interest conveyed by the said complainant in said deed.— Said deed purports to convey the equity of redemption of the said complainant to this defendant in twelve hundred acres of land, and sixty-five slaves. It was found, howev-er, that one of the slaves mentioned in said deed, value a-

bout      dollars, was not included in the Bank mortgage, and there being no incumbrance on him, he was taken in execution to satisfy the debts of the said complainant, and sold by the Sheriff for that purpose.    Of the sixty-four which remained, one old man has since died, and eight of them are perfectly worthless, by reason of consumption, dropsy, deformity from sickness, burns and chronic rheumatism, with which diseases, &c., they were afflicted at the time of said last mentioned conveyance, and so far from their being valuable or profitable, they are an expense to the plantation.

" Thirteen of the said number of sixty-four slaves were children, under the age of nine years, and about eight of the number were from forty-five to seventy years old, and about eight or ten others ranging down from five to ten years of age, at the time said conveyance was made. This defendant alleges that taking all said slaves as a gang, they were not likely, are altogether an expensive set to support, and they were not at the time said conveyance was made worth upon an average, as he believes, more than about two hundred and fifty dollars apiece.    This defendant further alleges, that of the lands included in said conveyance, much lies in the swamp and in the woods, and if it had been unincumbered and sold at public sale, it is not reasonable to suppose that it would have brought more than the adjoining lands of equal, if not superior quality, on three sides, which sold on a credit of one, two, and three years, at from a little more than one, to three dollars and fifty cents per acre.    The amount of said complainant's subscription for stock in the Union Bank, for which said property had been mortgaged, was about thirty-two or three thousand dollars, and the amount of

the judgments which were soon after rendered against the said complainant, in favor of said Bank, for money, in the Circut Court of Jackson County, was about twenty-seven thousand dollars, as this defendant is informed and believes. This defendant purchased said property, subject to both these claims, amounting in all to about sixty thousand dollars, under these estimates, or any reasonable estimates which could be made of the value of the property in said conveyance mentioned, and of the amount of incumbrance which said Bank had upon said property.

" This defendant confidently alleges that the consideration mentioned in said deed of conveyance to him is full, adequate and altogether sufficient for the interest (it being a mere equity of redemption) in said property, which the said complainant conveyed to him in the deed of the 13th day of December, 1845, as mentioned in said complainant's bill of complaint. This defendant positively alleges that the said last mentioned deed had no connection whatever with the said deed of trust of the 19th November, 1844, but was wholly distinct from, and independent of it. That while the trust deed of 1844 was tainted with fraud, the deed of 1845 was made for a good and valuable consideration—was honest and *bona fide* in all respects, free from fraud, secret trusts and all other fraudulent contrivances—was made without any undue influence or unfair practices upon the part of this defendant, and executed by the said complainant, after due reflection, and in a sober and rational state of mind, and was drawn up and prepared by a legal gentleman employed by the complainant himself for the purpose, a gentleman whose heart is too pure, whose nature is too honest, whose intellect is too clear, and whose legal learning is too accurate and pro-

found, to have allowed him on the one hand to have become the instrument of fraud, or upon the other to have made a blunder in conveyancing, at which a mere tyro would be ashamed. This defendant having become the purchaser of the said complainant's equity of redemption in the property described in the said deed of the 13th December, 1845, gave the complainant his obligation to pay off and discharge *all the debts* of the said complainant for which this defendant was liable as endorser or security, and also certain other debts mentioned in said obligation, and which were designated by the said complainant, which said debts in all amounted at least to the sum stated as the consideration in said deed, if not more. If less than $6000, this defendant was to pay other debts to the said amount."

He further says, that since that time, he has paid up the greater part of the debts mentioned in the said obligation, and that he is ready to pay the balance which may yet remain unpaid.

That this defendant has, time after time, offered to rescind the whole contract upon being indemnified for the monies paid and the liabilities incurred by him for and on account of the said complainant.

He further says, that if he did not pay interest on the Union Bank debt of the said complainant under the said deed in trust of 1844, it was because he had no means in his hands as trustee to pay the same; and this defendant further says, that after said deed in trust was decided to be fraudulent and void, this defendant had nothing more to do with it, *and could not be compelled to act under it.*

In behalf of complainant, Joseph W. Russ testifies:—
" That his plantation adjoins the Rock Cave plantation,

that they lie side and side for about a mile.   Has been living there before and ever since Samuel Bellamy owned the place.   That he has been well acquainted with the plantation and negroes of Samuel Bellamy, but not so well of late, since it went out of his possession.   It was looked upon while in the possession of Samuel Bellamy by witness and everybody else who knew it, as *one of the finest plantations in the* country.   That witness had rather have it than any plantation he knew of for the number of acres. Samuel Bellamy made fine crops there—that he made from 250 to 300 bales of cotton per year, and one year witness thinks he made over 300—bales were the same size as usually made in the country, they were formerly not so heavy as at present—from 500 to 600 lb. bales are usually made now, some as high as 700.   Samuel Bellamy made full provision crops—does not know that he sold any.

"That in the fall of 1845, the Rock Cave plantation, would have sold for as much as any land in the country— does not know what land was selling for at that time— thinks there were between 1000 and 1200 acres of cleared land, and when in possession of Samuel Bellamy the houses, fences and other improvements were in good order and fit for use—*thinks the negroes were first rate negroes, as good* as any in the county.   That he lived by them a long time, and found them honest and peaceable, and manageable, and healthy as any other negroes."

R. B. Carlton, another witness in behalf of complainant, states : "That he came to this country with Samuel C. Bellamy, and overseed for him in the years 1836, 1837, 1839 and 1840, that he is well acquainted with the character and value of Samuel C. Bellamy's negroes, and that there were 40 working hands at the time he overseed for

him, *and were as valuable a set of hands as any in Jackson County.* That he settled the plantation, and cleared most of the land ; that there were a good many likely young hands growing up at the time. *The land was very good,* and Samuel C. Bellamy once, in his presence, refused $20 per acre ; and witness considers it would make as much per acre as any land in the country, and that he has made it ; that he has had a good general knowledge of the plantation since, and especially since 1841, and also of the hands, and has been there as often as once a week since that time.

" That since the plantation has been in the possession of Edward C. Bellamy, for the last year or two, it has gone down to nothing. That since the negroes went out of the possession of Dr. S. C. Bellamy, witness had seen them frequently, but the present year he had not seen them much, except a few of them. That since they had gone out of Dr. S. C. Bellamy's possession he had not seen any of them well clothed, that they appeared poor and scrawny, and he frequently met them on the road and did not know them as some of the negroes he came from North Carolina with."

Hugh Spears, a witness also for complainant, testifies ; " That he is well acquainted with the Rock Cave tract of land, he supposes there are 1000 or 1200 acres—a good deal of swamp and ponds on the tract—*that in* 1845 *about* $6 *per acre, would have been a fair cash price for the plantation, land being then low.*"

Judge Baker, a witness in behalf of said defendant, says in his answer to 10th cross interrogatory : " I was present when the value of Dr. S. C. Bellamy's property was spoken of. I do not remember what was said by each in-

dividual. I can only state that when $6000 was stated as the consideration in the deed, it was signed by Dr. S. C. Bellamy without objection. I have already stated that he was *not intoxicated* when he signed the deed; so far as I was capable of judging, *he seemed to understand what he was about.* I do not know that others were consulted about the value of the property. Judge Carmack thought that $6000 was as much as the property would bring at a cash sale, over and above the liens and incumbrances upon it. I was under the impression that the consideration in the first deed was $6000 ; in this, however, I may have been in error."

In his answer to the 11th, he further states : "Judge Carmack advised E. C. Bellamy to buy the property, as I have before stated. He moreover advised them not to have a private understanding, either verbal or in writing. He probably meant by this advice to guard them against just such a suit as the one now pending."

In another place, in his answer to 69th cross interrogatory, he says : " *Judge Carmack seemed to be the friend of both* Samuel and E. C. Bellamy." Judge Carmack in his deposition read in evidence by the defendant, in speaking of the deed of 1845, of which he is interrogated, states : " That the deed was drawn by witness at the instance of Edward and Samuel Bellamy. That as well as witness can state at this late day, after so long a lapse of time, that after the deed of trust of       intended to secure Edward Bellamy and others, had been overruled by the Court and declared fraudulent and void, and the decision acquiesced in by the lawyers who defended it, Samuel C. Bellamy detained witness two or three days in this county consulting him about the matter, (Edward Bellamy not being

present at the conferences, and as witness believes he was then absent, where, he does not remember.)   Witness was detained, as well as he recollects, after the plan had been settled, until the return of Edward C.  Bellamy, that witness might assist in consummating the plan.

" That another important circumstance in declaring the old deed a nullity, fraudulent and void, was,  according to his recollection, that it was for a very long and indefinite period of time.   That when consulted by Samuel C. Bellamy, he avowing *it was his  object  to  keep his property together,* witness told him it could not be  done  by a deed of trust, unless it be forfeited in some reasonable time.   That in this matter of the deed annexed, *witness told Samuel and Edward Bellamy to  have no  secret  understanding, either verbally or in writing,* and that   Sam.  must trust to Ned's generosity.  And witness has no doubt he did so, and thought that Edward Bellamy would return  Samuel his  property after he had paid his debts ; this, however, is mere  matter of opinion , but nothing to warrant such an opinion  passed at the time of  the execution of  the deed, and   not for some time after.   Nothing but  their  relationship, and Sam's willingness to trust his brother with the possession and control of  his property,  induced this opinion.

" That the reason of the   great haste to execute a   conveyance of  some kind to somebody, that  would stand, was because the newspapers stated that there was a bill before the Legislature to sell   the equity of  redemption, and  witness gave it as his legal opinion that the executions would be a lien upon the equity, and would postpone any sale  or conveyance made after the lien attached.    The two matters of  fact most constantly in witness' mind at the time of the execution of the deed and since, was witness' repeated.

12

*advice to both* Edward and Samuel Bellamy that they should have no secret understanding, or trust, that this property should ever be delivered up to Samuel C. Bellamy, and both of them protested that there should be no' such agreement or understanding. The other fact is that witness told Samuel C. Bellamy *that he must leave* the plantion conveyed in the deed, and to exercise no control over it, or any negro conveyed in the deed, and he agreed to do so. That witness advised them both that Sam. should sell out for a full, fair and equate consideration, or words to that effect.

The deed was executed in Gen. Baker's office, at Marianna, and both parties were present at the time of execution. And said deed was undoubtedly intended by complainant and defendant as an absolute and unqualified conveyance. That both parties were friendly at the execution of the deed, but witness does not recollect the particulars of the conversation; thinks they conversed as much about other matters as about the deed ; that from *their conversation witness judged that Sam. had* unlimited confidence in his brother.

At the time of the execution of said deed, Samuel C. Bellamy *was neither intoxicated nor deranged*, but, that he reasoned like a man who had a *purpose* to carry out, and was capable of appreciating the most effectual means for carrying out that purpose. That he reasoned accurately and well, as witness thought. And that as to his insanity, though witness lived in the community, he never heard it suggested 'till long after this period. There was no connection whatever between the said deed and the trust deed of 1844, so far as the parties themselves understood it ; on the contrary, the parties themselves knew the fact to be,

that the old deed had been declared fraudulent and void by the Court, and that their counsel did not hesitate to advise them not to carry it up to the Supreme Court; the deed being hopelessly void and fraudulent. That the complainant and defendant said nothing about any connection between the two deeds that witness heard.

Edward C. Bellamy was to pay six thousand dollars of complainant's debts, most or all of which he was responsible for as complainant's surety, and this was the consideration of the deed.

In reference to the testimony of Judge Carmack, a letter from John Tanner, the Examiner, and which is found in the record, states: That soon after his appointment to take testimony in this case, he called on Judge C. to take his testimony, and he was so ill, that he had to call several times before he could complete his answers to the direct interrogatories, and when he went to examine him upon the *cross interrogatories found him dead.*

Doctor Philips, on being asked whether or not the said Samuel C. Bellamy was, at the time of the execution and delivery of said deed, of sound mind and capable of thinking and acting in the ordinary affairs of life?

Answers: " *I think he was.*"

Again, he says : " That for about a year before the execution of the said deed, I know that he was very much harassed and his habits were intemperate ; that he was melancholy and violent in his temper, but when sober, I thought him capable of transacting business."

" A short time before the execution of the deed of 1845, Edward Bellamy did say to me in presence of Sam. that he had been pointing out to Sam. *how he could secure both of us.*"

" The only consideration which I saw was the obligation

of Edward Bellamy to pay certain debts of Samuel Bellamy to which he and myself were sureties. I don't recollect whether I witnessed it or not, nor do I remember certainly that it was delivered to Sam, but think it was delivered to Sam."

" The contents of the consideration, as near as I can recollect, Edward Bellamy obligated himself to pay a debt to Miles Everett of about a thousand dollars, to which he was security ; also a note of Sam's to the Life and Trust Bank, to which he was security for about twenty-five hundred or three thousand dollars, a note to William J. Baker, to which I was security for about three hundred dollars."

In the testimony of John T. Myrick, the Deputy Sheriff, there is a list of judgments and executions vs. S. C. Bellamy—of these, the following were before the 19th November, 1844, the date of the execution of the trust deed, to wit : Perkins, Hopkins and White, judgment 6th June, 1843, $212,38.

John W. Southall,      judgment 19 Oct., 1843, $275,25.
Green Mitchell,            "      9 June,  "    676,01.
John Brett, Jr., for use &c.,  "  19 Oct.,   "  1430,86.
N. C. Robbins,            "    27 May, 1844, 2703,63.

Among the receipts filed by defendant, it appears that Robert Myers, Marshal, held an Execution on judgment of Isaac Widgeon, of 19th Oct., 1843, for $309,45.

The following judgments also appear which were recovered between the first and second deed, to wit :

The Union Bank,    judgment 8th May, 1846, $27,710,64.
Wm. Sullivan, Adm'r.,   "   27th Noy. 1844,  3,320,67.
Miles Vance,            "   20th  "    "     322,36.
Geo. A. Croom,          "   2d. Dec'r. 1845, .1,160,36.
Hugh Spears for use &c. "   22d. Nov., 1844,  1,272,92.

Samuel Stephens, the Sheriff, testifies : That he made a levy on Executions in favor of said Miles Vance, and Sullivan's Administrator (when this levy was made don't appear, but it must have been previous to December Term, 1845,) he says, however, he was Sheriff at the time of the sale, in 1846, which took place, according to the testimony of Mr. Myrick, the first Monday in January, 1846, on Executions in favor of Sullivan's Administrator and Miles Vance, an account of sales of which appears in his testimony, marked Exhibit X.; and at that sale the said Edward C. Bellamy bought cotton, hogs, corn, cows and calves and cotton seed, his bids amounting to about $1800.

Mr. Myrick also testifies that D. Pittman, as Deputy Marshal, made a levy for the sale stated in paper Y on executions in favor of Perkins, Hopkins and White, Southall, Brett and Mitchell, which must have also been before December Court, for he says : the right of property was tried in December. At this sale Edward C. Bellamy bought mules and horses amounting to

Mr. Stephens further testifies : " That he had a conversation with Dr. Edward C. Bellamy before the sale—about the time of the sale, and after the sale—*that he understood from E. C. Bellamy that he had bought the property* at the sale for the *purpose of keeping the property together, and keeping up the farm to aid his brother, Samuel C. Bellamy.*" Witness thinks he understood it from him several times in this way : witness thought his language applied to *all he bought in.* He thinks these remarks were made to him at Rock Cave while he was delivering the property to him, and also probably in town ; he delivered him stock cattle, stock hogs, meat hogs, corn and seed cotton in the gin house. All these he delivered to E. C. Bellamy at the plan-

tation.   Witness did not understand Dr. Edward Bella-
my (in his presence) to claim the property purchased *at the
sale for his own benefit.*   Witness was of impression before
the sale that Dr. Edward C. Bellamy was going to pur-
chase this property *for Samuel C. Bellamy, and was of that
impression all the time.*"

" That he received the impression that Edward Bellamy
was going to buy in the property at the sale for Samuel
Bellamy, *from conversations with Edward Bellamy,* and this,
witness thinks, *was the general impression,* and several per-
sons told him they would not bid  for the property because
they thought it was going to Samuel Bellamy's benefit."

Witness Myrick further says :  " He does not think the
negroes in paper Y brought near their value—the other
property did not bring its full value he thinks ;  does not
think the other property so much out of the way ;  the mules
came nearer the mark."

"That about the first of February, 1846, S.  C.  Bellamy
was complaining to him, witness, of E.  C. Bellamy and wit-
ness told E.  C. Bellamy of it, and he requested him to quiet
S.  C.  Bellamy—that he was doing all  of  this business for
S.  C.  Bellamy's good.   I told Ned Bellamy that Sam Bella-
my had complained to me—that he believed Ned. Bellamy
was going to take his property from him,   I told him this
about the time the bill of sale for the negroes was made to
William Bellamy, and this was the first time I heard of any
dissatisfaction on the part of S. C, Bellamy about the pro-
perty."

"Edward Bellamy replied *that he was doing it all for Sam's
good,* and asked me to *quiet* him ; by dissatisfaction before
mentioned, witness means that S. C. Bellamy was not dis-
satisfied with E. C. Bellamy  because  the  bill of sale was

made to William Bellamy, that was what he wanted done in paper marked X."

" That the complaints which witness mentioned as coming from Samuel Bellamy were about *the whole property* which Edward Bellamy had got from Samuel Bellamy, and which complaints witness communicated to Edward Bellamy, and it was to *these* that Edward Bellamy made the reply before stated."

" That Samuel Bellamy and Edward Bellamy had quarrelled about the last deed which was drawn by Judge Carmack, and *before then*, witness had thought that the property had been bought in by Edward Bellamy for Samuel Bellamy, and *after* that quarrel commenced, Edward Bellamy told him that the property he bid off on the first Monday of February he had bought fairly, and he *meant to keep it*, except the five negroes."

The witness Russ testifies, that he " was present in town when Samuel Bellamy's stock was sold, in Marianna under levy. Thought the property sold very cheap, there was not much competition, persons did not bid freely ; that E. C Bellamy he thinks, bought most of it. Did not observe that persons were less disposed to bid against Edward Bellamy than others. Witness thought that Edward Bellamy was trying to keep Samuel Bellamy out of his difficulties, and a *great many persons thought so*, and such was the general impression so far as witness knew, but does not know that his own, or the general impression was correct. There were at the sale alluded to, some persons who bid against E. C. Bellamy. The property he saw sold, sold cheap, for *less than he thought the value of it.*"

April 10th, 1845.

"Memorandum of an agreement entered into between Ed-

ward C. Bellamy, trustee of the property of Samuel C. Bellamy, of the one part, and E. P. Moore, of the other part, witnesseth : That the said E. P. Moore is to do the duties of an overseer on the plantation of the said S. C. Bellamy faithfully, and to give prompt and ready obedience to all orders of the said E. C. Bellamy, in regard to the business of said plantation. And the said E. C. Bellamy, as trustee aforesaid. agrees to pay the said E. P. Moore the sum of three hundred and fifty dollars out of the crop made on said plantation ; but in no event is it understood between them that said E. C. Bellamy is to pay the said Moore out of his own money, but as trustee as above mentioned ; the said Moore to do the duties from the 1st of January up to the 1st of December, and to be furnished with board for himself and horse during the time."

E. C. Bellamy, Trustee.

Eli P. Moore.

There was much additional testimony, which we have gone over with great care ; but we do not think it materially varies the case.

The following decree was made in the Circuit Court sitting in Chancery, from which decree the defendant below, Dr. E. C. Bellamy, appealed to this Court.

In Equity—Western Circuit.

Jackson County—Fall Term, 1850.

Samuel C. Bellamy, Complainant, }
         and            } Bill for Acc't., Relief,
Edward C. Bellamy, et. al., Def'ts. } &c.

This cause came on to be heard at the Spring Term, 1850, of this Court, before the Hon. George S. Hawkins, Judge of the Western Circuit, upon bill, answer of defen-

dant, Edward C. Bellamy, replication, exhibits, and proofs taken in this cause, and the same having been fully argued by counsel for both parties, and the matters in dispute fully considered, and the judgment and decree to be given in the premises fully advised of, his Honor doth think fit, and so orders, adjudges and decrees :

First—That the deed of conveyance of the said complainant to the said defendant, Edward C. Bellamy, bearing date the thirteenth day of December, in the year of our Lord, one thousand eight hundred and forty-five, (1845,) mentioned in and exhibited with said complainant's bill of complaint, for the reasons at large set forth in the opinion delivered in this cause, was and is wholly inoperative and void; and that the said Edward C. Bellamy should and ought to account for the trust property and funds conveyed by and possessed under the trust deed from the said complainant to the said Edward C. Bellamy, bearing date the nineteenth day of November, in the year of our Lord one thousand eight hundred and forty-four, also mentioned in and exhibited with complainant's said bill of complaint.

Secondly.—It is further adjudged and decreed that the said defendant, Edward C. Bellamy, holds that portion of the trust property and profits and issues thereof, purchased by him at the sales under execution by the Sheriff of Jackson County on the first Mondays of January and February, 1846, subject to the uses and trusts limited and appointed in the aforesaid deed of the nineteenth of November, in the year one thousand eight hundred and forty-four, and is liable to account therefor.

Thirdly :—It is further ordered and decreed that the defendant, Edward C. Bellamy, account before George F. Baltzell, Esq., one of the Masters in Chancery of this Court,

13

upon and at such time as shall be appointed by said master, of and concerning the aforesaid trust and the execution thereof, rendering a full, true and perfect account in detail of all and singular the trust property and funds committed to his charge, and the rents, issues, profits, crops and proceeds issuing out of the same, or accruing therefrom, which he, or any other person for him, or by his consent or procurement, received therefrom, or which he might, could and ought, by the exercise of reasonable diligence, to have received. Said accounting to be upon due notice to complainant or his solicitor, and according to the usual mode of proceedings in the office of the master ; and that said master make report of said accounting, and the evidence taken before him thereon, with all convenient speed.

*Fourthly.*—It is further ordered and decreed that the said Edward C. Bellamy be removed from his said trust, and ousted of his said trust estate ; and that he deliver over to the Receiver hereinafter appointed all of the said trust property, and funds, and the rents, issues and profits, and crops arising from or issuing out of the said trust property, now in his hands, power, possession or control, and thereafter stand and remain restrained and enjoined from any interference with, control over, or management of the said trust property, 'till the further order of this Court in the premises.

*Fifthly.*—It is further ordered and decreed that Frederick R. Pittman, of the County of Jackson, be appointed Receiver of this Court in this cause, upon his entering into bond in the penalty of ten thousand dollars, ($10,000,) with good and sufficient security to be approved of by the master aforesaid, and conditioned for the due and faithful performance of his duties ; and that said Receiver shall, with all

convenient speed, demand and receive from the said Edward C. Bellamy, the trust property herein before mentioned, and shall rent out the plantation, and hire out the slaves at public auction by the year until the further order of the Court in the premises, and shall render and file in the office of the Clerk of this Court annual accounts and returns of his actings and doings in the premises, and of the amounts of funds and securities in hand.

*Sixthly.*—It is further ordered and decreed, that the said George F. Baltzell, master as aforesaid, do also proceed to ascertain and report to this Court the names of the Creditors of the said Samuel C. Bellamy, who are entitled to the benefits of the trust estate, heretofore conveyed by the said Samuel C. Bellamy to the said Edward C. Bellamy as aforesaid, with the amounts due to each respectively, and the respective order of priorities ; and for this purpose the said master shall make advertisement for the presentation of such claims, within such time as he shall deem reasonable and proper in the premises.

And that all further directions are reserved until the coming in of said reports.

GEORGE S. HAWKINS, Judge, &c.

---

OPINION.

From the testimony in the case, it is not satisfactorily established, as charged in the bill, that the mind of the said Samuel C. Bellamy, at the time mentioned, was so affected from his habit of indulging in the use of intoxicating liquors, or from any other cause, as to render him incompetent from mental imbecility to know and perform any of the duties incident to the ownership of property, *when sober.* The important questions therefore in this case are: 1st. Whether

at the time the said deed was executed, marked "Exhibit C. D." and dated 13th December, 1845, and, whether at the time of the purchases at the Sheriff's sale in January and February, 1846, (or at either of them,) the said E. C. Bellamy had been so *divested* of his fiduciary capacity as *trustee*, &c., as to prevent all the consequences of his acting, both for himself and for the *cestui que trust.*

*Secondly.*—Whether, if he was not so stripped of his character as *trustee*, he could in law, have made said purchases, or either of them, without being subject to equities that attach to such purchases.

It becomes necessary for us in considering these questions to enquire :

*First*—Whether the trust deed of 1844, was as between the parties thereto a good and valid instrument?

*Second*—What property was embraced therein?

*Third*—Whether the property purchased by E. C. Bellamy at Sheriff's sale was the same as that included in the deed?

*Fourth*—Whether the slaves and lands, or any interest in them, or either of them, included and mentioned in the deed of 1845, formed any part of said trust?

In construing either or both of said deeds, the Court is authorized in looking to the motives that led to them, and the objects intended to be effected by them; and doing this, they must depend on the circumstances at the time.

The first question to be determined under the conveyance in trust is, whether it was *void*, as between the parties, at the time said purchases were made by said Dr. E. C. Bellamy, or whether it was merely *voidable* as to creditors?

It is laid down as law in 1 Story's Equity Jur., §371—"That although voluntary conveyances are, or may be void,

as to existing creditors, they are perfect and effectual, as between the parties, and cannot be set aside by the grantor, if he should become dissatisfied with the transaction. It is his own folly to have made such a conveyance. A conveyance of this sort (it has been said, with great force) is void only as against creditors; and then *only to the extent* in which it may be necessary to deal with the conveyed estate for their satisfaction. To this *extent* and this *only* it is treated, as if it had not been made. To every other purpose it is good,—*satisfy the creditors and the conveyance stands.*" See opinion Yates J., in Newman vs. Kapp, 5 Binney 76, 8 Gill 501.

It is by no means certain that the conveyance now under consideration was void *at all.* It is well settled law, that a person in failing circumstances may prefer creditors. A sale, assignment, or other conveyance, is not necessarily fraudulent, because it may operate to the prejudice of a particular creditor. The delay necessarily resulting from a fair exercise of these rights is not prohibited by any statute.

The case of Ravisies vs. Alston, Trustee, 5 Ala. 302, is a case very analogous with this. In that case the Court sustained the deed of trust even against a creditor and remark, " *it is not a badge of fraud* that the grantor remained in possession after the execution of the deed, as such possession, was consistent with its terms, and the debts, or a considerable portion of them to *secure which it was made, were not due.*"

That there was no time specified within which this trust was to be performed, does not strike us, as a badge of fraud. Would it not be like a note without time specified for payment ?

But we do not undertake to decide whether this deed was

void or not, and for the purpose of the consideration of the matters before us, we will consider it as *voidable* by creditors.

As to the creditors then, the deed was only voidable, and the preferred creditors, though not parties to the declaration of trust, *may claim* under it.    4 John. Ch. 529.

Dr. E. C. Bellamy was himself a preferred *quasi* creditor,—by said trust deed, he became a *trustee*, not only for Samuel Bellamy, but for the *other creditors*—he accepted the trust, and as one of the preferred beneficiaries derived benefit from it.    To say, that he shall not fulfil his trust, so far as in his power to do so, would be giving the power of the Court to aid him in making gain.    Having accepted the trust, he could not disclaim and throw it off.    He cannot set up or insist that this deed was fraudulent,—he has undertaken to carry into effect its objects and purposes.— See Strong vs. Willis, 3 Fla. Repts. 124.    He was a voluntary party to it, and thereby negatives any fraudulent intent, besides both complainant and respondent, in their bill and answer *disavow* that their *object* was to hinder or delay creditors.    Courts have refused relief, where the *avowed object* was to hinder and delay creditors.    This was not the principal motive here, no such object was avowed, although the result might have operated delay.    What is the deed ? It is but a conveyance to a trustee, (himself a *quasi* creditor,) for the benefit of himself and other preferred creditors, When these debts are paid and the objects secured, the property was to be reconveyed.    Such a stipulation is not fraudulent.    Johnson vs. Cunningham, 1 Ala. Repts., 258.

Now this was neither illegal, immoral, or against public policy, and if the intent of the transaction was to delay creditors, it was not to hinder and delay the *final* payment,

therefore, it could only as *against them,* be illegal, immoral or against public policy.   Murray vs. Riggs, 15 Johnson, 571.

The Statute of Florida sustains the view here taken.   It provides that conveyances to the end, purpose, or intent to delay, hinder or defraud creditors of their just debts *shall be as against* the person or persons so *intended* to be delayed, hindered or defrauded, deemed void and of none effect.— The Statute on this subject in some of the States is different, for instance, in Ohio it is unlimited in its terms—ours is not.   *Expressio unius est exclusio alterius.*

Great stress seems to have been laid upon the result of the trial in the claim case, and because it was on that trial decided, by the jury under the charge of the Court, that said deed was fraudulent as to creditors, therefore, it was assumed said deed was void " in toto," of course void as a trust deed, between the parties, and as to other *cestuis que trusts.*

The trial spoken of was under our statute, with regard to claims of property levied on, and the only question in issue, was, whether or not the property levied upon was subject to the executions levied.

In equity, as between the parties, the general maxim of *pari delicto* does not always prevail. · Circumstances of the particular case often form exceptions, and where it is *necessary,* relief will be granted.

The following are among the cases where relief against *particeps criminis* has been granted upon the application of the grantor.

See 1 Story's Eq. Jur. §380, Eastbrook vs. Scott, 3 Vesey Jr. 456.   In this case the assignor (Israel Levi) was joined in the bill with one of the creditors.   The Master of

the Rolls says, "both Levi, upon principles of public policy, and Eastbrook, as a creditor in the deed, have an interest upon that." It will be seen that Israel Levi, under a *private agreement*, executed and delivered two bonds, &c. of which the said Master of the Rolls, says : " *It is impossible to deny that the bonds were a fraud upon the creditors.—— The defendants admit it.*" Yet the bonds were ordered to be delivered up. See also Austin's Admx. vs. Winston's Extx., 1 Hen. and Mun. 33, Hill on Trustees 164, Williams vs. Avant, 5 Iredell 50, Starke's Extx. vs. Littlepage 4, Randolph Repts. 372, 8 Leigh's Repts. 512.

Without commenting further on this branch of the subject, we think the trust deed of 1844, as between the parties was good and valid.

The next question is as to the construction given to the words of the deed of trust.

It is contended on the part of the Appellee, that this deed did by the operation of its terms and according to the *intent* of the parties, convey all the property, real and personal, specified in the deed of December, 1845.

The Appellant insists that neither by the terms of the deed of assignment, nor by the intention of the parties, was the land and mortgaged negroes conveyed therein.

It is conceded that a deed is to be construed by the *res gestæ*. In looking to the circumstances and motives which led to this assignment, and the objects to be accomplished, we find, that said Samuel Bellamy was embarrassed—he was expecting executions to be issued against him—he was in possession of a plantation and negroes, and his planting interest was so extensive that he was, according to the testimony, raising from 250 to 300 bales of cotton per year, and according to the testimony of Myrick and answer of E. C.

Bellamy, there were then several judgments against him amounting to between six and $8000, and others soon to be recovered—that the interest on his Bank Mortgage had to be paid, &c.—he feared creditors would come down upon him before money could be realized from his crops and other sources, and by seizure of slaves, stock, farming tools and utensils, utterly prevent him from paying his debts—bring loss and distress upon his securities and endorsers and immediate ruin upon himself. His plantation and the negroes, not specially named in said deed of assignment, were mortgaged to the Union Bank—the remainder of his property was unencumbered. To prevent the sacrifice and destruction of the interests of his sureties, endorsers, creditors and himself, which would be completely effected by the breaking up of his planting operations by a forced sale of his unencumbered property, at a ruinous rate, he executed to his brother this trust deed.

The defendant says, " That being anxious to secure himself *against losses* on account of his said endorsements, upon being *informed of the embarrassments* of the complainant, *readily agreed to accept the security and indemnity proposed, and this defendant presuming that it would secure the objects* avowed, *executed and accepted it.*"

Here then we have the motives and objects declared on both sides, and distinctly understood—on the one side it was " to save *loss* and *distress*"—" to prevent breaking up his planting operations"—" *to save his property from sale.*"—On the other, it was to obtain security from loss, and the security and indemnity proposed was accepted, to secure the " *objects avowed.*"

For which objects the said S. C. Bellamy sells, grants, bargains, conveys, assigns, transfers and *delivers* to E. C.

14

Bellamy " all the property and *estate*, hereinafter described and specified, to wit :

The following slaves, (naming them) also his stock of horses, mules, cattle and hogs, together with his household and kitchen furniture, and all his *personal effects* of every name, nature and description, corn, wagons, carts, &c.    Also his crop of cotton of the present year, whether now in bales, in the gin house, or in the field, &c.—that the *aforesaid* Edward Bellamy shall have and hold the aforesaid *property*, upon the following trust, and for these interests, objects and purposes hereinafter set forth, that is to say, that the said *Samuel C. Bellamy shall continue and remain* in possession of all this property and effects *above specified*, &c.    That the said *Edward C. Bellamy* shall receive all the rents, profits, hire and income, derived from the same, to wit : the *services* and *labor* of said personal property" &c.

Let us here make a rest, and go back and see what the " *services* and *labor* of said personal property above specified" would amount to. Upon reference, we find there were *five* slaves *specified*, to these add *horses* and *mules*, and we have all the " *specified* personal property," from which, with the Bridge contract, after paying necessary expenses, the said Edward C. Bellamy was " *to reimburse, secure* and *indemnify*, &c., and to pay the judgment debts which were then due and of record, some of which had been recovered for several months, and as Samuel C. Bellamy informed him constituted the " *embarrassments*" that must be settled to prevent *a sale* and the breaking up of his planting operations, and for the paying, with all due promptness, the interest on the Bank Stock.

Now it cannot be supposed that any two men in their senses would have intended, with such objects to accom-

plish, this assignment to cover no *other property* than that specified.

To return to the said trust deed.   We find it further stated, as follows : " and it is herein *further provided*, that all the future cotton crops made on said *plantation* shall be appropriated by said Edward C. Bellamy, trustee, to the *purposes* and *objects* above set forth and declared, especially the *interest on the Union Bank Stock*, excepting part of said cotton crop as well as corn, *also* hereby conveyed, as shall be requisite for necessary expenditures and subsistence."   What " plantation" is here spoken of ?  We do not find that " plantation" is referred to any where else in the deed—the words " *estate*". and " in the field" are mentioned. Why so particular as to specify *twice* in said deed the payment of the " interest on the Union Bank Stock ?"   Did it matter as to the specified property, whether the interest was paid or not ?   Was it not important as to the planting interest—the raising of future cotton crops that said " interest on the Bank Stock should be paid ?"

E. C. Bellamy, when the objects of the trust should be accomplished, was to return to S. C. Bellamy " all the property conveyed by the said deed, and all his interest and right therein either in *equity* or at *law*."   Take away an interest in the mortgaged property and what did they mean by the term " in equity ?"   Retain an interest in the mortgaged property and the expression is reconcilable.

Again, we think we can see here an *intention* to assign in this trust, something beyond the *specified* property mentioned in said deed.

The words of the deed itself, viz : " all his personal effects of every name, nature and description" would, according to the general rule, embrace only things, *ejusdem generis,*

with those which have been mentioned before—those which might not have been supposed to pass under the words there made use of. Cavendish vs. Cavendish, 1 Bro. Ch. Repts. 468 and note (a). Burney vs. Rout 7, Taunton 79, Ingell vs. Nooney 2, Pickering 365. Applying this rule to this deed we think the mortgaged slaves and other personal property passed under said deed of trust, but that it did not convey the Equity of Redemption in the land.

It is essential to the conveyance of real estate, that there be some description of the land. This ingredient is wanting in this conveyance. " All the future cotton crops made on said plantation" are conveyed. By referring to the first part of the deed we ascertain, on what land these crops are to be made ; it was on the land where the " crop of cotton of the present year" " in the field," was, and this inference is supported by the bill and answer.

It is insisted with much earnestness on the part of the complainant, that this conveyance of " future crops " passes the equity of redemption in said land. We do not think so. In our opinion it was only a license or conveyance of all that was necessary to the management of the plantation and appropriation of said crops, and for this purpose he was entitled to enter upon said lands, either in person or by overseer, (as it seems he did in the employment of Moore,) gather the crops of cotton, and take possession of them. The objects were that he, E. C. Bellamy, was to manage the plantation, have such an interest in and control over, the future crops grown on said plantation, as to save and protect the same from levy under execution, and to sell them for the purpose of fulfilling the trust.

We do not consider it important to the trust, how great

an estate was conveyed, whether a fee, or only an estate for a specific object. In our opinion the said E. C. Bellamy had a fiduciary interest vested in him as trustee, by virtue of said trust deed, in the slaves and lands embraced in the said mortgage to the Union Bank, and in order that he might perpetuate this fiduciary interest in the *future crops*, and keep the property all of it together until the purposes and objects set forth and declared were attained, out of them, he was *especially* required to pay the interest on the Union Bank stock. Upon his paying this interest on said stock note, which was about $1700 per annum, he could not be dispossessed of the land (whether of the negroes is yet a question) by the Bank for *twenty* years ; this would make the interest of Samuel Bellamy in the lands, at any rate, at the date of the trust deed, equal to a term of *twenty* years use of the property, subject to a rent charge (interest) of $1,700 per annum, and this use or interest was conveyed in said trust deed, so far at least, as to claim and receive the future cotton crops thereon. Thus construe this deed and we have a reasonable amount of property from which said E. C. Bellamy might hope to obtain the indemnity and security he was seeking.

Trustees in all cases take an estate commensurate with the object of the trust. 7 Mass. 188. And such an estate we think was vested in Dr. E. C. Bellamy in the plantation and slaves. If he did not have such an interest in said land and slaves, then the conveyance of "future cotton crops" made on said plantation, was nugatory. That Samuel Bellamy was permitted to remain in possession of the property, is not deemed inconsistent with the trust. The parties did not consider S. C. Bellamy's possession as inconsistent with E. C. Bellamy's working the slaves on the plan-

tation, for we see E. C. Bellamy on the 10th April, 1845, as *Trustee*, employing Eli P. Moore as overseer, who, without any objection from S. C. Bellamy, went on to act as such overseer.   The corn, provisions, &c., necessary to provision the plantation, and to the making of the crop, *for which pur-* *pose, and not for the use of the grantor*, are reserved in the deed.   Dr. E. C. Bellamy had a right to enter upon the premises at any time, for the purposes of this trust, and to take away the crops of cotton.   The circumstance that Dr. E. C. Bellamy permitted his brother to remain on the premis- es, in the assignment, instead of being a badge of fraud, as between these parties, entitles him to commendation.

It is urged by the Solicitor for respondent, that in the con- veyance of future crops, it is shown : "*that it was expected that time should be obtained to make the money to pay the debts.*   Be it so; this but strengthens the view we take of the deed.   Having thus determined that the mortgage slaves, and an interest in the lands, sufficient to carry out the ob- jects of the trust, were embraced in said trust deed of 1844, it follows, as a matter of course, they were thus far subjects in the deed of 1845.

We are now to enquire whether he had been divested of his fiduciary capacity, as trustee, at the time he made said purchases or either of them ?

How or in what way had he been divested ?   Had he fulfilled the trust, and settled up his accounts ?   Had he paid the interest on the Bank Stock ?   Had he paid the debts as he had agreed to do ? and particularly, had he ap- plied the Bridge money to the payment of the Sullivan debt? Had he been discharged from his trust ?

It is contended that the deed of 1844 was treated by the par- ties as void, and that as all the unencumbered property had

been levied upon, there was nothing left for the trustee to do. That E. C. Bellamy treated it as void, and insufficient for his indemnity and security, appears plausible enough. But there is no evidence, that S. C. Bellamy treated it as void.    He says : "it was represented to him to be void"—"that harassed by the ruin impending, or which he supposed to be impending and near at hand he executed "Exhibit C. D."

Judge Baker, in his testimony says :   "When I first heard S. C. Bellamy, E. C. Bellamy and Judge Carmack conversing, the object was stated to be to save and secure E. C. Bellamy as security for S. C. Bellamy." "The deed of trust having been decided to be fraudulent and void as against creditors, *Judge Carmack was of opinion* that the only effectual mode of accomplishing the *object* was for Dr. E. C. Bellamy to buy the property and make the best terms he could with the creditors.   He so advised them."

Judge Carmack states :  " There was no connection *whatever* between the said deed and the *trust* deed of 1844, so far as the parties themselves understood it."   Here then is no evidence that they even intended rescinding the trust deed ; on the contrary, they were seperate transactions.  Is there any evidence to show that either party treated the trust deed as void ?   Does it not all go to show they only considered it *void as against* creditors ?  Much reliance was placed in the argument of this cause upon the position of Judge Carmack.   It was assumed, that he was the friend, adviser, attorney and agent for S. C. Bellamy alone, and therefore his acts should be binding on S. C. Bellamy.  The proofs do not sustain this position, on the contrary, the testimony of both Judge Cermack and Judge Baker is that Judge Carmack was acting as the mutual friend of the parties—he was the adviser of *both* parties, and the Attorney

and agent of both parties, therefore no more effect is to be given to his acts for one, than the other.    Again, the property levied upon had not yet been sold ; it was not sold until one month, and two months thereafter.    What do we find E. C. Bellamy doing at the sale?    Does he act like a man whose fiduciary capacity was at an end ?    See the testimony of Stephens, Myrick and Russ.    They testify that such was his conduct at these sales, as to lead these persons and the whole community to understand that he was still acting as trustee.    He *purchases in the property*—tells persons that he had bought the property at the sale for the "*purpose of keeping the property together*," and "*keeping up the farm to aid his brother Samuel*," and so marked were his acts, that according to Mr. Stephens, "*persons said they would not bid for the property because they thought it was going to Samuel Bellamy's benefit.*"  A short time after the sale, when told by Mr. Myrick that Samuel C. Bellamy was dissatisfied, Dr. E. C. Bellamy tells Mr. Myrick, "*that he was doing it all for Sam's. good, and asked him to quiet him.*" Besides, some of the monies paid for these purchases, were out of the trust fund, to wit : the Bridge contract money, and other part applied on executions owned by E. C. Bellamy.

Does this look as though said trust was treated as at an end ? Was not this all perfectly consistent with the trust deed ? with the objects of the one, to *keep the property together*,— the other, to *secure* himself, &c.

Take all the circumstances together, and put a fair and reasonable interpretation upon the acts and transactions of both parties, can it be considered otherwise than that Dr. E. C. Bellamy continued acting and was acting as trustee at the time of the *purchases* and execution of the deed of 1845.

It may be said that Samuel C. Bellamy surrendered the first deed or destroyed it by executing the second.    The answer to this is, that neither the deed or the proof show that he intended doing so, and had he endeavored to do so he could not have accomplished it.    The first deed had been duly executed and delivered, and the *trustee* had entered upon the duties of the trust under it, therefore, as to his duties it was as yet executory and not executed ; a subsequent surrender or destruction of it would not *divest the estate* conveyed by it.    Nelson vs. Halsey 1, John. Ch. 418.

We are therefore forced to conclude, that the interest of said S. C. Bellamy, herein declared to be embraced in the deed of 1844, vested in Edward C. Bellamy under said trust deed, for the *interests, objects* and *purposes* therein specified, and at the time of the said purchases and execution of said deed of 1845, the said E. C. Bellamy held the same, as such trustee, and that he purchased the same without sanction of any Court authorizing him thus to purchase, and without being discharged from his trust.

Having decided that Dr. E. C. Bellamy was not, at the time of said purchases or either of them, divested of his character as trustee, the next question is, could he, in law, have made such purchases or either of them, *without being subject to equities that attach to them ?*

It is obvious that if these purchases are permitted to stand, the *intent, objects* and *purposes* of the trust deed are defeated, and by whom ?    By the act of the *trustee.*    He may succeed in his object of security and indemnity, but the *ces-tuis que trusts* are thwarted in theirs.    Is this what he covenanted to do ?

Dr. E. C. Bellamy entered upon the duties of this trust, with a knowledge of the trust and confidence reposed in

114           SUPREME COURT,

Edward C. Bellamy *vs*. Samuel C. Bellamy's Adm'r.—Opinion of Court.

him. He occupied, from his own choice, the position and relation of trustee, and confidential agent, friend and brother.

The weight of English authority is against the right of the trustee to purchase the estate of his *cestui que trust*, and is predicated upon reasoning, the force of which must impress itself upon every mind. To permit a trustee to purchase while he is enjoying the confidence of his *cestui que trust*, it is said, would be to license him to speculate by abusing his situation. His duty obliges him to exert all the care and industry necessary to dispose of the estate as advantageously for his *cestui que trust*, as if he were selling for himself. His interest would sometimes thwart his duty, and the infirmity of human testimony, would render it impracticable at all times, to prove its violation; hence the policy of the rule which divests him of a legal capability to purchase. The great difficulty of discovering a disregard of the rights and interests of the *cestui que trust*, induced the determination of the Courts that the *trustee had no right to purchase, so long as his vicarial character continued.*

It is settled law in the United States that " in all cases where a purchase has been made by a trustee on his own account of the estate of his *cestui que trust*, although sold at public auction, it is in the option of the *cestui que trust*, to set aside the sale, whether *bona fide* made or not·" See note (e) (containing a long list of cases of American Courts) to Fox vs. Mackreth 2 Bro. Ch. Repts. 337, (Perkins' Edition) 1 Story's Eq. Jur. §332.

In some of the Courts of this Country, this rule has been relaxed in purchases by administrators at their own sale, and held not void *per se*, but *prima facie* valid if no unfair-

ness appears.    The reason given for it is, because they sell under order of the Court authorizing them so to do, and account of sales is returned to the Court for confirmation.

Judge Story says : " It may be laid down as a general rule, that a trustee is not to do anything which can place him in a position *inconsistent with the interests of the trust,* or which have a tendency to interfere with his duty in discharging it."    The purchase of the Equity of Redemption in the land is inconsistent with the objects of the trust, to wit : the keeping the property together.

Chancellor Kent asserted this doctrine in Davone vs. Fanning 2. John Ch. 268, and his judgment in that case has been pronounced to be " one of the ablest and most important ever delivered by any tribunal of justice."  In some of the English cases reviewed by him, it was held, that there were exceptions to the *annulling* of a purchase.    In speaking of the Chancellor holding such an exception, Kent says : " He seems to think the Court are only to be satisfied that there was not *fraud in fact,* whereas it has been again and again decided, *and the principle pervades the whole body of the cases,* that the inquiry is not whether there was or was not, fraud in fact.    The purchase is to be set aside at the instance of the *cestui que trust,* and a resale ordered, without weighing the presumption of fraud, on the ground of the temptation to abuse, and of the danger of imposition inaccessible to the eye of the Court."

The learned Chancellor refers to the case of the York Buildings Company vs. McKenzie, 8 Bro. P. C., which was decided in the English House of Lords, wherein his doctrine was completely vindicated.    In this last case, the House of Lords, set aside the sale, ordering the purchaser to account for the rents and occupation in the meantime, with a lib-

eral allowance to him for his permanent improvements.

Again, it does not appear that the property bid off by the said E. C. Bellamy was purchased at its full value ; on the contrary, the witnesses all agree that the goods at the Sheriff's sales sold *below their value*, and the supposition that said E. C. Bellamy was purchasing for the benefit of Samuel induced the people not to bid.

Neither are we satisfied that the consideration of the purchase in the deed of 1845 was *adequate*.

The Bill charges that the Bank funds might have been purchased at a *very great discount*, and this is not denied in the answer. The proofs are very defective respecting the whole of the consideration of this purchase. As to the land and negroes, Mr. Russ is conclusive, that they were valuable ; he fixes no price to slaves—" *thinks the negroes were first rate negroes, as good as any in the county.*" The witness Carlton also confirms this. A plantation and negroes that produce from 250 to 300 bales of cotton per year, must be considered valuable. It is very clear it would not take long to work out $6000, on such a plantation.

The complainant in his bill, charges, "*that he was not consulted or bargained with in relation to the consideration expressed in said deed.*" This is not denied in the answer. The debts contracted to be paid by E. C. Bellamy were not to be paid in any specific time. It is evident then, that were *time* secured by this arrangement, the property would soon pay the $6000 debts. This is a fact considered "*plausible,*" against the consideration as stated in Barrow vs. Bailey, Fla. Reps. The weight of testimony goes to show that the amount of consideration was fixed upon between Judge Carmack and E. C. Bellamy. The defendant

in his answer, says, that Samuel Bellamy was intoxicated the day before, and then signed a similar deed, but that he respondent, would not " *accept the delivery thereof, on account of its being signed and sealed by the complainant* in the situation in which he then was." "The complainant then came back on the following morning in a sober and rational situation, and executed a *newly* drawn deed, the *s*ame in *substance* as the one he had signed the day before." It is true E. C. Bellamy says, that both deeds were drafted at the request and under the direction of the said Samuel, but the proof is that Judge Carmack was acting for *both* parties. Judge Baker is positive that the agreement contained the Southall debt, and gives very conclusive reasons why he should testify on that point, yet when we look at the agreement it does not contain that debt. Judge Carmack says the " *plan* " was agreed upon between them, but he does not say what the amount of the consideration was. There is no evidence to show that Samuel Bellamy was consulted as to the amount of consideration. Judge Carmack says, it was executed in *great haste,* they were afraid of a Bill before the Legislature, &c. Besides Dr. E. C. Bellamy in his answer, says : he had been to Tallahassee *procuring an execution* to be issued against Samuel C. Bellamy, &c. Now how could S. C. Bellamy's object to keep his property together be obtained by conveying away the whole title to it ? Taking these facts together, the remark of Judge Carmack, that it was executed in " *great haste,*" appears evident.

The case presents many extenuating circumstances, but they do not in our judgment wholly overcome the inequitable features of the transaction.

The conclusion is irresistible, that the deed was hastily

entered into, arising perhaps, out of a *mutual* reliance and the judgment and advice of their mutual friend and adviser, and without any intention of taking any advantage.

We are of the opinion, that the said purchases should be set aside and vacated upon the following conditions, viz : That the said Edward C. Bellamy shall be reimbursed any monies, with interest, advanced by him in consequence of said trust or purchases, such as the payment of debts, expenses or otherwise, and that all and every the security debts, mentioned in said deed of trust, shall be satisfied and paid, so that said E. C. Bellamy shall be discharged therefrom, also any reasonable costs or expenditures including reasonable fees, of *two* counsel in and about this suit, and upon payment of a *liberal* allowance for his trouble in managing said estate, upon settlement of his trust accounts of all said property, *so that he may be fully indemnified,* and lose nothing excepting wherein his *wilful* neglect should make him chargeable.

That upon these conditions being complied with, the said Edward C. Bellamy, shall execute a quit claim deed, of the said property thus purchased by him, to such person as he may be directed by the Court.

That if upon taking an account of any of the property thus purchased, it should appear that some of it has been disposed of by said E. C. Bellamy, he should only be debited with the price for which it was purchased, unless it is ascertained that he sold said property at a profit ; if so, then at the price for which it was sold, but if the price of the original purchase cannot be ascertained, then at the value at the time of the purchase. The Master should be directed to proceed in his duties under said decree, and the Receiver required to file accounts, and directed to pay

costs and to pay over monies to said Edward C. Bellamy, or otherwise as directed from time to time. As this is but an appeal from an interlocutory decree, authorized by Statute, the cause must be remanded back to the Circuit Court for futher action, and the decree appealed from must be modified and altered in said Court, so as to conform to the views expressed in this opinion. And the costs of this appeal must come out of the trust estate.

### DISSENTING OPINION.

Hon. T. F. King, Judge of the Southern Circuit, delivered the following dissenting opinion :

The objects sought by the bill in this cause are that Edward C. Bellamy, the Appellant, be declared the trustee of Samuel C. Bellamy, the Appellee, for certain property mortgaged to the Union Bank of Florida, the equity of redemption in which was conveyed by the Appellee to the Appellant on the 13th December, 1845, by a deed absolute on its face ; that the Appellant be made to account for the issues and profits of said property as well as other property held by him, as trustee of the Appellee, under a deed of the 19th November, 1844, and that he be removed from his said trust.

A number of other persons, creditors of the Appellee, are included in the bill as defendants, but none of them seem to have appeared so that this contest is confined to Samuel C. and Edward C. Bellamy.

The facts as contained in the pleadings and evidence having been fully set out in the opinion of the Court, I will proceed to consider those points which I think material to the decision of the cause.

The first question that arises is as to the truth of the allegation in the bill that the property conveyed in the deed of 1845, was included in, and conveyed by, the trust deed of 1844.   The deed of 1845 conveys to the Appellant, Samuel C. Bellamy's equity of redemption in sixty-five negroes and twelve hundred acres of land mortgaged to the Union Bank. In the deed of 1844, there is no specification by name of these negroes nor description of this land, nor are they referred to as mortgaged to the Bank, though in the deed of 1845, the names of the negroes and the boundaries of the land are fully set out. The description of the property conveyed by the deed of 1844 is as follows : "Tony, Sally, Flora, Esop, Cinda ; also his stock of horses, mules, cattle and hogs, of which he is now in possession and which cannot be more particularly described, together with his household and kitchen furniture, and all his personal effects of every name, nature and description, corn, wagons, carts, &c. ; also, his crop of the present year whether now in bales, in the gin house or in the field ; also all his right and interest in and to the contract for constructing the bridge across the Chipola river, near Marianna."

It is insisted by the appellee in his bill and by his counsel in argument, that all his personal property whatever, passed under the general terms " personal effects of every name, nature and description."   The authorities show however that all property of the nature of that referred to in general terms does not necessarily pass, particularly when the terms are followed by specifications as in this case.   The meaning of such general words in a contract is to be arrived at by measuring them with the rule of intention, and if necessary they will be narrowed and shortened so as to conform to the scope and design of the in-

strument, as on the other hand words of a signification more limited when standing by themselves will be enlarged to meet the purpose as gathered from the other words of the contract.

Was it intended then by the deed of 1844 to convey in trust the lands and negroes contained in that of 1845 ? It will be observed that the appellee in his bill avers that the slaves only were included in the wor ds, " all his personal effects," &c., and at the same time he alleges that both land and negroes and all the profits from them, were the subject of the trust, and prays that the Appellant shall render an account of his management of the whole. Why the land should not have been included in the deed as well as the slaves, if both were the subject of trust, is not explained.— The land was required for cultivation by the negroes, and the negroes were required for the land and they were both included in the same mortgage to the Union Bank. The land was as much liable to the grasp of creditors as the negroes, and why he should have desired to protect the one more than the other by covering it up in his trust deed, it is difficult to perceive.

But it was contended in the argument that to give effect to another provision in the trust deed, not only the negroes must have passed but the land also, and without such a construction the objects of the trust must have failed. This provision is that " all the future cotton crops made on said plantation shall be appropriated by said Edward Bellamy, trustee, to the purposes and objects above set forth," &c. The proposition of the Counsel is true that if the ends of the trust required it, the land and the negroes both passed to the trustee as well as the crops. Green vs. Biddle 8. Wheat. 1, Earl vs. Grim 1 John. Ch. R. 494 and cases there

15

cited. Was it necessary then that the trustee should have them, as well as the crops? I think not. The plain reading of the clause is that the Appellee should appropriate the crops to certain purposes, not make them. His trust was to apply them, when "made" and put into his hands, in the payment of certain debts, and when they were so applied all was done that he had promised. There was no obligation on his part to assume the care, trouble and responsibility of managing the plantation and making the crops as well as applying them.

It appears from the answer that the Appellant in 1845, made a crop with the 65 negroes, and on the Appellee's plantation, which are the property conveyed in the deed of 1845, and that he paid the wages of the overseer and other current expenses of that year. It is contended that these acts serve as a guide to the intention of the parties and show the design to have been that the Appellant should take this property by virtue of the deed of 1844 as well as that specified in it.

On examination of books on evidence, I no where find so broad a doctrine laid down as that contracts may be construed by the subsequent acts of the parties. In the case of Cooke vs. Boothe 8, Cowp., the question was, whether in a lease with a covenant of renewal, its terms authorized a renewal in subsequent leases. The Court allowed evidence to show that there had been several successive renewals, holding that the parties, by their practice, had placed their own construction on the covenant and were bound by it.— It will be observed that in this case the Court was construing an ancient deed. When the same question arose in the case of Iggulden vs. May, Lord Mansfield remarked of Cooke vs. Boothe, that he thought it was the first time that the acts of the parties to a deed were made use of in a Court of

of law to assist in the construction of that deed.  Lord Eldon, when the case of Iggulden vs. May was before him in Chancery, 9 Ves. 325, over-ruled the doctrine in Cooke vs. Boothe, and none of the cases since, that I can find, conflict with his ruling.

In the cases cited in argument of Livingston vs. Ten Broeck 16, Johns. 22, Atty. Genl. vs. Parker, 3 Atk. 396. Atty. Genl. vs. Foster 10 Ves. 338, and Weld vs. Hornby 1 East. 199, the question was upon the construction of ancient deeds and charters in which by a well settled rule, usage may be proved to show that, which because of their antiquity cannot be otherwise understood.  In the more recent case of French vs. Cochart 1 Comst. R. 96, but one of the eight judges who sat in the cause laid down the rule contended for, and he relied upon the four cases just referred to.  The question before the Court did not require them to go so far and they held only, the contest being as to the purposes for which a stream of water was reserved, that evidence should be admitted to show that one of the parties knew at the execution of the deed, the fact of the existence of a mill and dam on the stream and of the manner the stream was affected by their use. In Bradley vs. Washington Steam Packet Co., also cited, the language of the Court is " that in giving effect to a written contract by applying it to its proper subject matter, extrinsic evidence may be admitted to prove the circumstances under which it was made, wherever without the aid of such evidence, such application could not be made in the particular case." In none of these cases was evidence admitted of matters that transpired after the contract was completed to show its meaning.

After looking into the authorities I see no reason to de-

part from the opinion already expressed by this Court in the case of Fry vs. Hawley, 4 Fla. R. 258, that the evidence of the subsequent acts of the parties to a contract is not admissable to construe it.   It would be a novel idea indeed if when a contract is entered into and the parties have proceeded under it for some time, they disagree and refer their dispute to the adjustment of a Court, the judge should be told that it is already construed by the action of the parties, and though one or both may have mistaken their rights yet they have settled its meaning by what they have done.

We cannot, then, look at the acts of the parties after the execution of the deed of 1844, to ascertain whether they meant to include in it the lands and negroes conveyed by the deed of 1845.   It must be read by the covenants on its face alone.   If the defendant took possession of the plantation and negroes, made a crop and paid the expenses, it was not in virtue of the authority given him by any clause in the deed of 1844, but by a mistaken construction, a subsequent agreement or a wrongful assumption of power, neither of which is complained of or is before the Court.

If we consider moreover the design in making the trust as revealed by the bill and the deed, it will be seen that there was no necessity for including in it the plantation and negroes in order to reach the ends sought by the parties.— This property being mortgaged to the Bank, was already secure from the grasp of creditors.   The fear was as to the unencumbered estate, all of which is specified in the trust deed.   The five negroes, the stock and materials of the plantation and the crop of 1844, already made could be seized at any moment by an execution.   The proceeds of the bridge contract were subject to the same fate as soon as they were realized, and the future crops

as soon as they were made. It was the "forced sales of this unencumbered personalty, to use the words of the Appellee in his bill, that would break up his planting operations and prevent him from saving his creditors and himself. This was all of his property in any danger and he covered it as he thought by a deed of trust.

There is a provision in the trust deed that Samuel C. Bellamy "should continue and remain in possession of the property." The rule is that a deed shall be so construed that if possible every part of it shall stand. What sense or object would there have been in this clause if E. C. Bellamy was to have the possession and control of the property ?

If the Appellant had sued Samuel C. Bellamy under this deed for the possession of the plantation and negroes, he would have been met by the decisive reply, "the plain reading of your covenant with me is, that I am to keep possession of all my property while you are to have and protect the legal title to all my unencumbered estate, and to take the proceeds of the whole as they come from my hands and use them in the manner we have designated."

Reading this deed then by the letter of its terms or by the surer guide, the scope and design of the parties, I do not see how we can say it includes the plantation and negroes, the far larger portion of the grantor's property.

The determination of this question carries along with it the argument based on its affirmation, to wit : that the property in the deed of 1845 being embraced in the deed of 1844, the deed of 1845 is void, because the trustee could not buy of his *cestui que trust,* or at any rate voidable at the option of the cestui que trust.   Admitting all the property to have been conveyed in the deed of 1844, I hardly think that the proposition so broadly stated can be applied to the facts of this case.

It is true, as a general principle, that the trustee shall not buy of his cestui que trust, but it is equally true that there are exceptions to the rule, and such sales have in a number of instances been sustained by the Courts. Mr. Hill, in his work on trustees, p. 535, says "such sales have frequently been supported in equity where it has been shown that the fiduciary relation of the purchaser had absolutely ceased previously to the purchase, or that the purchase was made with the full concurrence and consent of the persons beneficially interested, who in that case must of course have been competent to give their consent." The authorities he cites are Downes vs. Grayebrook, 3 Mer. 208. Randall vs. Ewington 10 Ves. 428. In Coles vs. Trecothick 9 Ves. 246, Lord Eldon held, " that a trustee may purchase from his cestui que trust, provided there is a distinct and clear contract, ascertained to be such after a jealous and scrupulous examination of all the circumstances, that the cestui que trust intended the trustee should buy, and there is no fraud, no concealment, no advantage taken by the trustee of information acquired by him in the character of trustee." To the same effect is the language of the Court in the case of Morse vs. Royal 12 Vesey 373.

The danger guarded against by the rule is that the trustee, from his relation to the property confided to him, will acquire such information of its value as will enable him to make a profit in purchasing from his cestui que trust, for if by such information, he take advantage of his cestui que trust, his conduct is inconsistent with the trust, for in assuming it, he promises to make the most of it for his beneficiary. The rule is wise and salutary and has, without doubt, often prevented fraud, but when the reason for the rule does not exist, it should not be applied. It ought not to be applied when parties by an express agree-

ment or virtually have laid aside the fiduciary relation and agreed to buy and sell. They then treat with each other at arms length. If after the trust has been created, the cestui que trust chooses to create a new relation and to stand towards him in the character of vendor, I see no reason why a sale between them should not be sustained as well as one from a trustee to a third person.

The prohibition by the general rule is that the trustee shall not buy from himself. He does not do so where there is a deliberate contract of sale between him and his cestui que trust. Nearly all the cases on this subject in the books, are where the trustee at public sale has bought property entrusted to him with directions for its sale, either to pay debts or to make distribution. Such was the purpose of the trust in Davon vs. Fanning 2 John Ch. R., decided by Chancellor Kent, and in all but one of the leading English cases which he there reviews. In all of them with two exceptions, in one of which the sale was sustained, the purchase or other transaction of the trustee in regard to the trust property was not with the cestui que trust and when there was no understanding with him or previous consent given. It may be remarked here that in Davon vs. Fanning, Judge Kent does not lay down the rule that the trustee may not buy in any case. He only recognizes the general rule " that a trustee to sell cannot himself purchase." In the case before us the relation of the Appellant to the property was rather that of a dry trustee, or one who merely holds the title, than that of one with power to sell. By the trust deed he had no power to dispose of the property. On the contrary, it was to be returned after a time to the Appellee. All the trustee's power was to hold the legal title and receive the rents and profits and apply them. There

is no question that one having the title only may buy. Hill on trusts 537. The leading cases in which sales have been made directly from the cestui que trust to the trustee, are those of Fox vs. McReth, 2 Bro. Ch. R. 400, Davison vs. Gardner, Sug. Vend. 436. Coles vs. Trecothick 9 Ves. 233. Monroe vs. Allain 2 Caine's Cas. in error 183. In Fox vs. McReth the sale was not sustained. It appeared that Mc-Reth had obtained information, to what extent was not precisely known, from an agent sent by him at the expense of the cestui que trust, to value the estate. Soon after and while trustee, he bought it from Fox for £39,000 and shortly after sold it for £50,000. In Davison vs. Gardner, the sale was sustained by Lord Hardwick because it was fair and for full value. In Monroe vs. Allain, the executor with power to sell, purchased from the widow who was also devisee and executrix. Circumstances were relied on to show that neither she nor her friends were acquainted with the nature or extent of the rights she undertook to convey, and the sale was set aside. In Coles vs. Trecothick, Lord Eldon sustained the sale, though for several thousand pounds less than the value of the property, and he observed " in this case you are not met by the danger that the trustee may buy with knowledge, acquired at the expense of the cestui que trust, that the value may be considerably more than he is aware of." In that case it was apparent that the cestui que trust had fully as much information as his trustee. The difficulty in these cases was as to the question whether the trustee by being trustee, obtained information of the value of the property which gave him an advantage over his cestui que trust. When the Court was satisfied that he had no such advantage, the sale was held good.

If we take it then as proved that the property in the deed of 1845 was held in trust under the deed of 1844, and was sold by S. C. to E. C. Bellamy while the trust relation existed, do the facts and circumstances in the record bring the sale within the rule or make it an exception ?   To determine this, we should look at the knowledge of each of the parties of the value of the property as derived from their position towards it previous to, and at the time of the sale, and from its nature and situation. It appears from the record, that for several years before the sale, S. C. Bellamy had been in possession of the land, had cleared most of it and had made crops on it with the negroes,—that in 1841 he mortgaged both land and negroes to the Union Bank for 322 shares of stock, worth $32,200, and received a loan of two thirds of the amount of his stock, or $21,900, the interest on which, when the deed of 1845 was executed, was $5000.   The Appellee had thus owned the plantation and negroes for years—had been with them, had made crops with them and had encumbered them with mortgages, to do which, a valuation was necessary, who could have had better information of the value of his property than he ? Who so familiar with the age, the health, the strength and capacity of each negro on his plantation as the owner ? Who knows so well the quality of each acre of land ?   It appears that the Appellant had made a crop with the negroes and land the year the deed was made, and we know of no other source of information he had as to their value.   It is hardly possible he could have been so well informed on the subject as the Appellee.   It was said moreover in argument, that the consideration in the deed was so grossly inadequate as to be evidence of advantage taken by the trustee, that at the time of the sale the stock of the Bank was much

below its nominal value, that the property could have been released from its encumbrances for much less than the amount of the mortgage and the money loaned on it, and that by keeping down the interest on the loan the property could easily have worked itself out of debt. We have no evidence to ascertain on what terms it may have been released from the Bank. It appears that the Bank was insolvent and consequently its stock and notes must have been below par, but I am aware of no rule by which Courts are bound to know of the rise and fall of depreciated Bank stock and paper, as they must know the date of a statute or on what day of the week a particular day of the month came on. The amount of stock due 20 years after was $32,000, of the loan, with the interest on it, $27,000, and the consideration of the deed $6000, making in all $65,000 as the amount to be paid off by the property taking the bank stock and loan at par. The value of the land and negroes at the time of the sale is uncertain from the record. Judge Baker, a witness, says land could not then be sold readily for cash at anything like its value, and negroes, though saleable, were low; other witnesses differ as to their estimates of the land. Taking though, at what I consider a liberal valuation, six dollars an acre for the land and $300 each on an average for the negroes, and the whole would have been worth $26,-700. As to the argument that it was twenty years before the mortgage was due, and the payment of the loan could have been delayed by keeping down the interest, it must be remembered that suit was then brought for this loan which would soon become a judgment, and then the payment of the loan could no longer be stayed by paying the interest, but the Appellee would have been at the mercy of the bank with its execution of $27,000. The best evidence we

have of the then value of this property is derived from Judge Carmack, a witness. He was the attorney of both parties in the transaction, was several days before the business was completed, consulting and advising with them, and his integrity and capacity are eulogized on both sides. His opinion was that six thousand dollars was a fair price for the land and negroes, taking in view the encumbrances on them. It should be observed that inadequacy is set up in the bill as one of the grounds of relief, and is denied by the answer, yet there seems to have been no effort to prove the fact. There could have been no great difficulty in finding out the value of these negroes and land in 1845, or what was the worth of the bank stock and paper. The inference is that the Appellee was satisfied the inadequacy could not be proved. Inadequacy of price however is not sufficient alone to set aside a sale. Hill on Trustees, 537 and cases therein cited, White vs. Walker 5 Fla. R. 487. It should be observed moreover with regard to this sale that, whether the deed of 1844 was void between the parties or not, after it was declared so as to creditors, the parties so considered it.

In the evidence is a receipt by Samuel C. Bellamy to E. C. Bellamy for $1357 in part payment of the bridge contract. The proceeds of this contract were to have been applied under the trust deed in the payment of debts. Why should this money have been paid by E. C. Bellamy or received by his brother if they did not consider the relation between them under the deed as dissolved? The receipt of it was a virtual recognition by S. C. Bellamy that his brother was no longer bound to perform the covenants of the deed, but was obliged to return all he had obtained under it. They therefore considered themselves as standing

in the same position to each other as before the trust was conferred and dealing at arms length.

Looking then at all the facts and circumstances appearing on the record, I am led to the conclusion that the defendant could not have derived any information from his relation to the property, had it in fact been held by him in trust, which could have given him any advantage in a purchase from his cestui que trust, and that this sale would have come under an exception to the rule that the trustee shall not buy of his cestui que trust; that in the words of Lord Eldon, it is an instance where there was a clear and distinct contract that the cestui que trust intended the trustee should buy, and where there was no fraud, no concealment, no advantage taken by the trustee of information acquired by him as trustee.

Another ground assumed in the argument, of this cause, was that if the property conveyed in the deed of 1845 was not included in the deed of 1844, and was not bought by the appellant as trustee, still the record discloses the fact that a secret trust existed between the parties at the execution of the deed of 1845, and that therefore, E. C. Bellamy should be held as trustee for that property and made to account for it.

Before considering the testimony on this point, I will advert to the character of the evidence which Courts require when an instrument of writing is sought to be impeached by parol proof. The English rule is to allow such proof, only in cases of fraud, mistake or accident, and if relief should be prayed against an absolute deed on the ground that it was intended as a mortgage or trust, some writing would be required before the charge in the bill could be sustained. A leading case is that of Leman vs. Whitty,

4 Russ. 423.   It was there clearly made out by parol evi-
dence, that the deed absolute on its face, was in fact given
without consideration, and solely for  the  purpose of ena-
bling the grantee, who had better credit, to obtain  money
for the grantor.    The bill prayed  that the devisee of the
grantee, who had, by will, the land conveyed  in the deed,
be declared a trustee for the grantor, but the Court refused
the evidence because not in writing.    In Cripps  vs.  Jee.,
4 Bro., Ch. R., 472, relief was granted, but a writing  was
produced in which the defendant acknowledged himself to
be a trustee.   In Irnham vs. Child, 1 Bro. Ch. R., 92, a de-
feasance was left out of the deed, on the idea that it would
make the transaction usurious.    The Court refused parol
evidence of an agreement that the property was to  be re-
deemable.    There is a diversity of opinion on  the subject
in the Courts of this country, but  the  larger  number of
them, including the Supreme Court of the  United  States,
and the Circuit Court of the United  States  for  the  First
Circuit, allow the fact to be proved by parol evidence, that
a deed absolute on its face, was intended as a mortgage or
trust, and they hold that the admission  of such  evidence
does not violate the Statute of frauds.  It is perhaps unfor-
tunate that our Courts  have  departed  from  the English
rule for the admisssion of such proofs where the design of
the parties was not to make the  instrument  defeasible on
its face; it is certainly in contravention of the policy of the
Statute of frauds and the general rule  of  evidence  as to
writings, which regard the instrument as the depository of
all the intentions of the parties concerning the transaction,
and  are  designed to  prevent  a resort  to the  " slippery
memory of witnesses," and to withhold temptation to fraud
and perjury  among those  who  would  gain  by destroying

the deliberate work of their own hands.    But the opinion seems to be in the Courts of this country, that justice would be more often attained by allowing parol proof of a reservation outside of the writing, and by that opinion, sustained as it is by such numerous and high authorities, I am willing to be governed.    But while assenting to it, I think the evidence to establish a meaning different from the face of the paper should be of the strongest character.    The design is virtually to add another clause to the writing, the effect of which in many instances would be to strip the grantee of all the rights he has acquired when the paper is read without the proposed clause.    The evidence should be as conclusive as that required to reform writings, on the ground of fraud, accident or mistake, for the end and effect in both cases is the same, that is, to break down entirely or impair the force of that which the law declares to be the best test of the deliberate and last intention of the parties in a transaction.    Lord Hardwicke said that there must be the strongest proof possible.    Lord Thurlow, that it must be strong, irrefragable proof, and that the difficulty of the proof was so great that there was no instance of its prevailing against a party insisting that there was no mistake.    In Townshend vs. Stangroom, 6 Ves. 328, Lord Eldon observed that those producing evidence of mistake or surprise, either to rectify a deed or calling upon the Court to refuse a specific performance, undertook a work of great difficulty.    In Gilespie vs. Moore, 1 John. Ch. R., 597, Chancellor Kent says, the cases concur in the strictness and difficulty of the proof, and in Lyman vs. United Ins. Co., 1 John. Ch. R., 364, where the bill prayed that a policy of insurance be amended, " no amendment was ever made without an

absolute conviction of the truth and precision of the real agreement." Judge Story says, " if the mistake is clearly made out by proofs entirely satisfactory, equity will reform the contract so as to make it conformable to the precise intent of the parties.   But if the proofs are doubtful and unsatisfactory, and the mistake is not made entirely plain, equity will withhold relief upon the ground that the written paper ought to be taken as a full and correct expression of the intent, until the contrary is established beyond reasonable controversy."

There are certainly admissions and facts developed in the record which give rise to a very serious doubt whether it was the intention of the parties to stand towards each other in the relation of vendor and vendee. Samuel C. Bellamy was in the situation of most persons, who convey away their property by an instrument, which is intended on its face to create the impression with the world, that it is irrevocable, when there is a secret understanding, that it shall afterwards be annulled.   He was deeply in debt and greatly harassed in mind.   He had already made an effort to secure his unencumbered estate which had failed.   Executions against him, greater than he could pay, were already in the hands of the Sheriff, and others to a large amount were hastening on.   Unless some cover was found his future crops, as they were matured, would be seized and even his equity of redemption in the lands and negroes were in danger from these executions, for it was supposed that a bill then before the Legislature would be passed subjecting such equities to a sale at common law.   Experience tells us, that it is the common recourse of men so embarrassed to devise secret trusts, that something may be saved from their ruined fortunes, and they naturally look to a brother or other near relative to aid them in their

trouble. In this dilemma, it appears he desired to make another deed of trust for an object similar to the first, and he proposed it to his brother. These circumstances certainly indicate his intention to save the property for himself. In connexion with them, may be taken the remark of E. C. Bellamy to Judge Baker after the trust deed was decided to be void, that he wanted something the lawyers could not break, and his further testimony that the object for which E. C. Bellamy and his brother were consulting with Judge Carmack, was avowed to be the security of E. C. Bellamy on his liabilities for Samuel. Also, E. C. Bellamy remarks to Stephens and Myrick, after the deed of 1845 was made, that he was doing the business for Sam's good—that he was aiding his brother who was not calculated to attend to his own business, and that the five negroes mentioned in the trust deed were bought by him at the sale in 1846 for his brother. These things go to show that he did not look on himself as the owner of the property. The admissions however, should be taken with much allowance, for they are, at best, a weak kind of evidence, and in most cases, can be explained only by him who makes them. If they had been stated in the bill as required by English practice, the Appellant may have given them a version entirely inconsistent with the idea that he considered the property his brother's. To support the presumption of a trust are also the offers of the Appellant to annul the deed on being indemnified for his payments and liabilities on account of his brother. All his statements though should be taken together. He says, in his answer, that the offers were made after S. C. Bellamy had threatened to do everything to injure him in purse and reputation, and even by taking

his life, and his object in extending them was peace, avowing however, at the same time, his full title to the property.

Further, it does not appear consonant with the ownership of the property that all the security debts in the obligation accompanying the deed, were contained in the trust deed of 1844, and that some of the debts paid after the deed of 1845 was made, were included in the trust deed and not in the obligation, also that after the execution of the deed of 1845, the Appellant should have gone on and paid other claims than those for which he had rendered himself liable in the obligation and paid them to an amount greater than the consideration of the deed. The reason for all this is by no means clear. It may have been that he was acting under an arrangement with his brother subsequent to the execution of the deed, or that under the fear of an attack on the deed from the creditors of his brother, and apprehensive for it, of a fate similar to that of the trust deed, of which he had had such recent and unpleasant experience, he judged it safest to buy up the claims against his brother.— But there is surely great room to presume that his aim was to carry out the design of the deed of 1844, which provided for the payment of all the debts.

Again, it may be asked why did S. C. Bellamy thus convey from himself every vestige of his property ? What profit was there in stripping himself of every thing?— Ordinarily in cases of this kind, the expectation is to save something in the end, and if there is no hope of this, the owner is indifferent upon what shore the wreck of his estate may be cast, or who will profit by its fragments. It may be considered in this instance as a motive for an absolute sale, additional to that usually prevailing in such misfortunes, that the appellant, a brother, was liable as

18

well as others, who he says without pecuniary considera-
tion, and as an act of friendship and kindness to himself,
were implicated for him as securities and endorsers ; that
he had nothing left but this equity of redemption, and this
might also be levied on and sold. Under these circum-
stances it may be, urged by a generous impulse to save
those for whom he felt a deep gratitude in preference to
all others, his brother refusing to have anything more to
do with trusts he resolved to make a sale, and save his
friends, if he could not save himself. It may have been
also without a word said on the subject, that he had a se-
cret hope and belief, his brother, if he succeeded with his
property, would restore it to him.

Taking all these circumstances together, there is certain-
ly much to induce the suspicion that an understanding
existed between the parties, that the ownership of the
property should still be in S. C. Bellamy. It must be re-
membered though, that in opposition to this suspicion are
the absolute deed and the sworn answer of the appellant.
He positively denies that there was any connection be-
tween the two deeds, and avers that the last was a *bona
fide*, absolute conveyance, free from any secret trust, and
Judge Carmack testifies that there was no connection be-
tween the deeds, that both parties protested there should
be no secret agreement or understanding, and that the
deed was undoubtedly intended by them as an absolute and
unqualified conveyance. It should be noticed that in all
appellant's conversations, he never says that he was the
trustee, or mortgagor, or agent of his brother. He avows
that his object in the purchase was to secure himself, and
that he afterwards offered to annul the deed if fully in-
demnified; but he nowhere admits that he did not have

the full title to the property and avers the contrary. There
is not a word of direct proof in the record, either of a
written or verbal understanding of the parties, that there
should be a condition to the deed.    If it did exist, we can
find it out alone by the circumstances that transpired af-
ter the deed was made, and which have just been referred
to.   The cases of Morris vs. Nixon, 1 How. R., 118, and
Jenkins vs. Eldridge, 3 Story R., 181, were cited to show
a similarity between the evidence on which relief was
granted in those cases, and the facts in this.   In Morris vs.
Nixon, the plaintiff applied to the defendant for a loan.—
The design of a loan was established beyond doubt by a
letter of the defendant and by the testimony of witnesses
who assisted in the negotiation as to matters which occur-
red before the affair was completed.    The *mode* adopted
to secure the loan was by an absolute deed of the land,
and a bond for the repayment of the money borrowed. The
proofs that the deed was intended as a security for the
loan were perfectly satisfactory.   In Jenkins vs. Eldridge,
it was alleged in the bill that there was a distinct under-
standing before the deed was made, that the land should be
reconveyed, after indemnification to Eldridge for his pay-
ment, in behalf of Jenkins and a suitable compensation
for his services about the property.    This allegation was
fully sustained by the evidence of the Counsel of Jenkins
in the transaction, and other witnesses.   One of them tes-
tified that it was agreed no bond should be given by Eld-
ridge, but that he should make a declaration or memoran-
dum of trust, which he was to keep among his papers,
and afterwards on being questioned, Eldridge replied, that
he had no objection to making such declaration and would
do so immediately.   Another witness stated that Eldridge

had often said to him that he held the estate in trust for the benefit of Jenkins, that he had often spoken of it in terms as Jenkins' property, and that he was merely acting as an agent and meant to be well paid for his services. In the case before us there is no evidence whatever of a previous agreement to hold the property in trust.— Judge Carmack tells us that both parties declared there should be no such agreement, and the defendant avers in his answer, that he bought the property absolutely. There is no evidence of acknowledgement in terms, in conversations between the parties or between the appellee and others of such an understanding, or that E. C. Bellamy ever admitted he was acting as a trustee or agent. There may have been a hope or expectation in the breast of S. C. Bellamy, that his brother would restore the property, but that hope or expectation alone was not sufficient to make this a trust deed. There must have been not only the intention on his part to make it a trust, but such must have been the design and understanding of E. C. Bellamy.— Where is the clear and satisfactory evidence to convince the mind that there was such an understanding by him? I must confess I have not been able to find it on the record. There is reason for conjecture and suspicion, a strong suspicion, I admit, but it is not fully proved. If we take it as proved that S. C. Bellamy designed a trust, but it is not clear that E. C. Bellamy designed it, how could a Court give relief against the face of this deed which it is the policy of the law to regard as the best test of the deliberate and last intentions of the parties? If a Court were to order a reform of the deed to meet the intention at the time of its execution, what would be the defeasance according to the proofs in this record? If a mortgage,

should then a provision for a foreclosure and sale, and if for a sale, after what time should it be made and for what amount should it be a security? If a trust, for what purpose? Should the appellant be compelled to pay the debts mentioned in the obligation or all the debts of his brother as provided for by the trust deed? In Morris vs. Nixion and Jenkins vs. Eldridge, there was no difficulty from the evidence had a reform of the deeds been prayed to have changed the one to a mortgage and the other to a trust. It is not the province of a Court to make writings for parties such as they probably designed, but to aid them in carrying out their intent where there is no doubt as to what they meant. If the proofs are doubtful, then in the words of Judge Story, "equity should withhold relief upon the ground that the written paper is to be taken as a full and correct expression of the intent, until the contrary is established beyond reasonable controversy."

It may be that in holding this deed to be absolute, the design of the parties would not be effected, and right and justice might not be administered according to the true state of the facts, existing at the time the deed was made; but if so, however, much we might regret it, this would be but one among a multitude of instances where justice could not be done by a Court, because of the insufficiency of the proofs. Courts of equity are governed by the same rules of evidence as Courts of law, and though they have power beyond Courts of law, to meet and relieve the hardships of particular cases, yet it is not one of their greater remedial powers to relax the rules of evidence, and before they can extend a remedy, the truth must be proved by the same stern and exacting rules as required by a Court of law.

Those rules were created from considerations of high public policy; a strict, inflexible adherence to them will more often achieve and sustain the right than secure injustice in its unlawful gains. It is better to suffer the wrong to triumph in one instance, than by breaking through these safeguards of truth, afford a precedent that will hazard the rights of many in subsequent suits of a like nature by opening an avenue to fraud and perjury.

Upon the whole, I am not satisfied that there was an understanding of the parties that the property should be held in trust. I think that to grant the prayer of this bill, would be to infringe the statute of frauds, and the general rule prohibiting parol evidence, when a contract is in writing, and would be affording relief in a case where in the language of Judge Kent, " an amendment would be made without an absolute conviction of the truth and precision of the real agreement." Entertaining these views, I am of opinion that the bill ought to be dismissed, except for the purpose of taking an account of the property specified in the trust deed of 1844, and its profits and issues.